**STATE of Tennessee**

v.

**Kirby STEPHENS.**

Court of Criminal Appeals of Tennessee, at Nashville.

June 19, 2007 Session.

Sept. 21, 2007.

Application for Permission to Appeal Denied by Supreme Court April 14, 2008.

Rehearing Denied July 7, 2008.

Thomas Harding Potter, Nashville, Tennessee, for the appellant, Kirby Stephens.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; William P. Phillips, District Attorney General; and John G. Galloway, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

DAVID H. WELLES, J., delivered the opinion of the court, in which NORMA McGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

The Defendant, Kirby Stephens, was convicted by a Fentress County jury of first degree murder and received a sentence of life imprisonment. In this appeal as of right, the Defendant presents the following issues for our review: (1) whether statutory violations in the jury selection process resulted in prejudice to him; (2) whether the trial court erred in its method of polling the jury by a "show of hands"; (3) whether the trial court erred by not requiring the State's designated representative, investigating officer Detective Gary Ledbetter, to testify first, violating the rule of sequestration; and (4) whether the evidence was sufficient to support his conviction. The State responds that, other than the Defendant's challenge to the sufficiency of evidence, his issues are waived due to his failure to timely file a motion for new trial. After review, we conclude that the Defendant's motion for new trial was timely filed and that there was no reversible error. The judgment of the trial court is affirmed.

### Factual Background

On May 31, 2002, Bertha Conaster and her husband, Harold Conaster (the victim), awoke around 6:00 a.m. at their home in the Crossroads community of Fentress County. Later that morning, the Conasters went outside to do chores in the yard— Mrs. Conaster "to pick some salad" and the victim to mow the lawn. The victim, noticing something unusual, stopped the lawn mower and said to Mrs. Conaster, "Somebody is down there in them pines.... I got a glimpse of him." Following this statement, Mrs. Conaster returned to "picking salad[,]" and the victim went to

the garage. The garage was on the "other side of the home" from where Mrs. Conaster was located in the garden; thus, she lost sight of the victim. Shortly thereafter, Mrs. Conaster heard a gunshot. She thought that her husband had fired a weapon and continued working in the garden. Approximately "ten minutes" passed before Mrs. Conaster went to check on her husband and found that he had been shot.

At approximately 9:30 a.m., Mrs. Conaster telephoned 911 and "said to please hurry and send someone to Harold V. Conaster on Wright Place Road, I think he shot hisself [sic]." Mrs. Conaster again telephoned 911 four minutes later and stated that she believed he was dead and that there was "no need to take him to the hospital...." The operator responded to Mrs. Conaster, "Please let them make that decision when they get there." According to the operator, Mrs. Conaster was "distressed enough" that she was asked to repeat herself.

Emergency personnel arrived at the Conasters' home and discovered the victim dead from a shotgun wound. Officers recovered several pellets from the scene and "the shot cup" of the shotgun shell—the portion of the shell that holds the pellets as the shot moves down the barrel of the shotgun. Based upon damage to the "trees and vegetation[,]" the officers determined that the shooter was standing behind some "brush" in Ms. Pearl Rozanski's yard, the Conasters' next door neighbor. It was estimated that the shooter was forty feet away when firing upon the victim.

Fentress County Deputy Perry Stockton was one of the officers who arrived on the scene and assisted in the investigation. While officers were investigating the scene, the Defendant's two sisters arrived. They "acted very concerned and wanted to know what happened, and they wanted to know if [officers] had" seen the Defendant.

After the scene was secured, Deputy Stockton was instructed to go to Jamestown and locate the Defendant, who was considered a suspect in the murder. The Defendant had previously been married to Ms. Rozanski. Although the Defendant and Ms. Rozanski had been divorced since 1995, the two continued to spend a substantial amount of time together.

Deputy Stockton proceeded to town and, at approximately 11:45 a.m., he located the Defendant in the parking lot of Ruth's Restaurant and the Dollar Store. Deputy Stockton pulled up beside the Defendant and asked him to get in the car and wait for Detective Gary Ledbetter of the Fentress County Sheriff's Department and Tennessee Bureau of Investigation (TBI) Agent Charles Scott. The Defendant was not told why he was being asked to wait, but he nonetheless complied with Deputy Stockton's request and got in the car.

Detective Ledbetter and Agent Scott arrived and talked with the Defendant:

> [The Defendant] said that he had come to town this morning—or the morning of the murder about 7:00 a.m. He was on the side of the road by Little Crab Road and Highway 52; had flagged down a ride from a boy in an old black Chevy pickup. He said the boy had brought him to town, [and] dropped him off at Arnold Wright's old store. Said he'd sat there for about an hour, walked over to the Diary Mart, said he'd sat there about another hour. Said he had talked to Bear Flowers who was the owner of the Dairy Mart at that time.
>
> He said after he did all that he walked back over to Arnold Wright's and that's where John Tipton had picked him up. Said Mr. Tipton picked him up at Arnold Wright's [s]tore and dropped him off at Ruth's Restaurant.

The Defendant denied being in the Crossroads community that morning and stated

to Det. Ledbetter that "he didn't see Pearl anymore, they no longer had a sexual relationship, but he didn't think she was seeing anyone else." The Defendant stated he owned some property in the area of Ms. Rozanski's, but he denied owning any guns. Detective Ledbetter then took the Defendant to the local jail for further questioning.

Later that day, the Defendant consented to a search of his residence, and Deputy Stockton escorted him there "to pick up some guns." Once they arrived, the Defendant "raised up the mattress and showed" Deputy Stockton where three guns were located—"one 12 gauge and one 20 gauge together ... and one 12" gauge that had been taken apart. Deputy Stockton also collected shotgun shells from the table beside the Defendant's bed, including "Remington 12 gauge double aught buckshot." The box of shotgun shells, which normally held five "live rounds[,]" only contained three. Deputy Stockton gave these items to Det. Ledbetter and Agent Scott.

The Defendant was taken back to the jail and read his *Miranda* rights. The Defendant then stated that "he didn't tell [the officers] about the guns because he was afraid someone would steal them." The Defendant did not otherwise change his statement and was released. At the end of the interview, the Defendant "just told [Det. Ledbetter and Agent Scott] that [they] would have to prove it in [c]ourt in front of a[j]udge." The Defendant also submitted to a gun-shot residue test during this time.

Ultimately, on November 27, 2002, a Fentress County grand jury returned an indictment against the Defendant, charging him with the first degree murder of Harold Conaster. A five-day jury trial was held from August 30, 2004, to September 3, 2004.

The State offered several witnesses placing the Defendant in the Crossroads community on the morning of May 31. Mrs. Nellie Grace Doss, who lived next door to the Conasters, testified that, on May 31, she had been in Cookeville. When she was returning home around 7:00 a.m., she saw the Defendant standing on Highway 52 near the picnic tables and West Cove Road. According to Mrs. Doss, the Defendant always walked and never drove. Mrs. Doss stated that, shortly after 8:30 in the morning, she heard a "big boom." After this loud noise, the Defendant's sisters arrived at Mrs. Doss' home, asking if she knew where the Defendant was.

Mr. Larry Russell testified that he was personally acquainted with the Defendant. On the morning of May 31 at approximately 7:40 a.m., Mr. Russell was going to town to cash a check, when he encountered the Defendant at the intersection of Little Crab/Helena Road and Highway 52. Mr. Russell picked up the Defendant, and they drove toward town. Mr. Russell "let off" the Defendant "at the little bluff at the top of the mountain there[,]" in the area of several picnic tables. He stated that Highway 154 "would be on the left after the bluff." During the ride, the Defendant and Mr. Russell talked about "ginseng digging and arrowhead hunting...." Mr. Russell "figured [the Defendant] was gonna do that there...." About two weeks earlier, Mr. Russell had dropped the Defendant off at that same place for "arrowhead digging and ginsenging...." According to Mr. Russell, when the Defendant "got out of the truck he kindly held on to the bed side and walked down the side of the truck holding on. He was headed ... back down the mountain." Mr. Russell stated that he did not drop the Defendant off at Arnold Wright's store that morning. Mr. Russell stated that he did not think it was possible for the Defendant to conceal

a shotgun in the overalls he was wearing on May 31.

Mr. Calvin Bruce Murphy and his wife went to a flea market on the morning of May 31 and then, about 10:00 a.m., went to "Peavy House spring" to get some drinking water. They filled their containers in a couple of minutes and left the spring. About seven or eight minutes later as the Murphys were "coming up the mountain," Mr. Murphy spotted the Defendant at the "ten-mile marker" on Highway 52 on the opposite side of the road heading in the other direction. Mr. Murphy turned his vehicle around and stopped to ask the Defendant if he needed a ride. Mr. Murphy did not know the Defendant prior to this encounter. The Defendant accepted, and the Defendant requested to go to "Crab Road." According to Mr. Murphy, the Defendant was "hot and smelled of sweat." The Defendant changed his mind, and Mr. Murphy drove the Defendant to town and left him at an establishment called April Showers at approximately 10:20 a.m. According to Mr. Murphy, the Defendant acted "like a normal person[,]" and the Defendant was not in possession of a shotgun.

Around 10:30 a.m. on May 31, Mr. John Tipton picked up the Defendant near April Showers and gave him a ride to Ruth's Restaurant. On this occasion, the Defendant was "[j]ust casual." Mr. Tipton testified that the Defendant, who had been a victim of theft, was "talking about shooting somebody that was stealing stuff from him[,]" stating, "If I ever catch him, I'm gonna shoot him...." According to Mr. Tipton, the Defendant was not carrying a shotgun at this time. Mr. Tipton also stated that he had seen the Defendant "many times" on Highway 52 walking to town.

Mr. Robert Elmore was at his brother-in-law's house on May 31 working on a tire. He heard gunfire from the direction of the Conaster home around 9:15 a.m.

There were two routes described at trial that lead from the area by the picnic tables where Mr. Russell dropped off the Defendant up to Ms. Rozanski's property. The State provided these descriptions to establish how the Defendant may have gotten from the picnic tables to the Rozanski property in order to commit the murder. A wooded trail originated from "Cove Road over at Highway 154," leading "up to the Rozanski and Harold Conaster home." This trail included "about 200 feet that [one would] have to go up and around a bluff." Former Fentress County Sheriff Mitch Stephens, who was sixty-six years old and had undergone open heart surgery, walked this route, which totaled 2005 feet in length, on a warm day in March in sixteen and a half minutes. He walked at a normal pace.

Utilizing the second route, 2938 feet in length, to the Rozanski barn from the picnic tables, one would "go up" West Cove Road, then turn left onto Edison Choate Lane, go past Robert Elmore's house, and then walk down an "old log road...." According to Mr. Elmore, the Defendant had been observed traveling this route "a bunch of times." Mr. Stephens traveled this route in approximately fourteen minutes.

A third route was detailed at trial in an attempt to provide the route the Defendant may have taken after shooting the victim. This route included walking down the bluff from Ms. Rozanski's barn and then down a "log road of some kind ..." This route "would bring [one] out on down on Highway 52 West by an iron gate." The ten-mile marker on Highway 52— where the Defendant was picked up by Mr. Murphy—is located two-tenths of a mile from where this third trail ends on Highway 52. Mr. Stephens walked this trail in thirty-nine to forty minutes.

Dr. Sandra K. Elkins performed an autopsy and determined that the victim "had four pellet entrance wounds on the front of his torso." The pellets recovered from the victim "were consistent with large pellets, consistent with like what they call double aught buck." In Dr. Elkins' opinion, these injuries were not self-inflicted.

Shelly Betts, employed by the TBI at the crime laboratory in Nashville, analyzed the ammunition found in the Defendant's home and the evidence recovered from the crime scene. Ms. Betts testified that the pellets found at the scene were "double aught buck lead pellets. . . ." Based on the "wad column" or "shot cup" found at the scene, Ms. Betts determined "that this was a 12 gauge shot wad column of the type that's manufactured by Remington and loaded in some of their shotshells." She stated that this combination of pellets and "wad column" was "not something that [she] had seen" before, so she telephoned the manufacturer Remington, who informed her that "they did load that [wad column] in their law enforcement reduced recoil buckshot loads." Ms. Betts stated that the shot column could travel up to fifty feet after being fired from the shotgun.

Regarding the ammunition obtained from the Defendant's home, Ms. Betts stated that the ammunition was "Remington Express buckshot—double aught is the size of the pellets, a 12 gauge, two and three-quarter inch shotshells." Ms. Betts disassembled one of the shells and saw that it contained "the power piston wad" normally only contained in the "law enforcement reduced recoil buckshot loads." According to Ms. Betts, this was "out of the ordinary" for Remington Express buckshot.

Following analysis of the weapons found in the Defendant's home, it was determined that none of those shotguns could have been the weapon used to kill the victim. Thus, the State needed to place another weapon in the Defendant's possession. Mr. Harvey Stowers, the owner of Harvey's Pawn Shop, testified that he sold a "12 gauge Pardner or New England" shotgun to the Defendant in October of 1998. This firearm was not located during the investigation. The State introduced the Firearms Transaction Record, which evidenced sale of a twelve-gauge New England shotgun from Mr. Stowers to the Defendant.

Agent Scott testified that he and another officer interviewed the Defendant in November of 2002 at the Defendant's home. After inviting the officers inside, the Defendant denied ever purchasing a weapon at Harvey's Pawn Shop. The Defendant also told Agent Scott that, on the morning of May 31, he had fired a shotgun at a coyote. However, Agent Scott testified that the gun-shot residue test performed on the Defendant on May 31 was inconclusive.

Mr. Steve "Bear" Flowers testified that the Defendant was not present in the Dairy Mart on May 31 and denied ever speaking to the Defendant on that day. Ms. Geneva Hooper stated that she did not see the Defendant at Arnold Wright's store on May 31.

According to Mrs. Conaster, Mr. Conaster helped Ms. Rozanski "all the time" with house work because he "felt sorry for her cause she didn't have nobody to help her." Mrs. Conaster stated that, about a month before the shooting, she had seen the Defendant "peeping through the bushes watching [the Conaster] house." Two or three weeks after the shooting, she saw the Defendant on top of Ms. Rozanski's house with tar and a mop, presumably "stopping the leaks. . . ." The Defendant was continuously "gazing over to the house" so Mrs. Conaster telephoned the police. The Defendant was gone by the time police arrived.

The Defendant, who was approximately seventy-seven years old at the time he was convicted, provided expert testimony concerning his numerous medical ailments. The Defendant also provided expert testimony regarding the ammunition found in his home and the investigation work done at the crime scene. The Defendant also implied during the trial that another party—a drunk driver who killed the victim's son in an accident—was responsible for the murder.

Following the conclusion of the proof, the jury found the Defendant guilty as charged, and the trial court imposed a sentence of life imprisonment. This appeal followed.[1]

## ANALYSIS

### I. Timeliness of Motion for New Trial

■ The State argues on appeal that the Defendant has waived all issues except the sufficiency of the evidence by failing to file a timely motion for new trial. The jury in this case returned its verdict of guilty on September 3, 2004. Immediately following the verdict, the trial court imposed a sentence of life imprisonment:

THE COURT: ... As a matter of law, bail, of course, is revoked and the sentencing situation is automatic in this. There was no—

[DISTRICT ATTORNEY GENERAL]: That's correct.

THE COURT: There's no special sentencing in this matter.

[DISTRICT ATTORNEY GENERAL]: That's correct, your Honor.

THE COURT: So, this will be a life with the possibility of parole. All right. You are in custody of the Sheriff's Department until such time as you are remanded to Tennessee Department of Correction [ ] custody.

The proceedings were then concluded.

Presumably sometime thereafter, the district attorney general prepared a uniform judgment document as required by Tennessee Code Annotated section 40–35–209(e)(1). The judgment form itself reflects the "Date of Entry of Judgment" as September 3, 2004. There are also two stamps on the document—the "file-stamp" showing that the document was filed with the circuit court clerk on September 10, 2004, and a minute-entry stamp reflecting the date of minute entry of the judgment as September 10, 2004.

The Defendant's motion for new trial was filed on October 7, 2004. The State argues that trial court entered the order of sentence on September 3 and, therefore, the Defendant filed an untimely motion for new trial. Accordingly, because the motion for new trial was not timely filed, the State argues that all issues raised on appeal, with the exception of the sufficiency of the evidence, should be waived. Relying on the minute entry, the Defendant responds that the order of sentence was entered on September 10, 2004,[2] and that his motion for new trial was thus timely.

---

1. Although the Defendant's notice of appeal was prematurely filed on August 18, 2006, the notice is nonetheless effective for appellate purposes. Appellate Rule 4(d) provides, "A prematurely filed notice of appeal shall be treated as filed after the entry of the judgment from which the appeal is taken and on the day thereof." Tenn. R.App. P. 4(d). Therefore, although the Defendant's notice of appeal predated the conviction judgment, the notice is treated as timely filed as of the date

the conviction judgment was filed, September 10, 2006.

2. The Defendant argues that the judgment form does not contain the order of sentence; he references a separate order of the trial court, contending that this order is the order of sentence. However, the order to which the Defendant refers contains no mention of his sentence and, as discussed *infra,* we conclude

█ Tennessee Rule of Criminal Procedure 33(b) provides that

[a] motion for a new trial shall be in writing or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered. The court shall liberally grant motions to amend the motion for new trial until the day of the hearing on the motion for a new trial.[3]

Because the provision is mandatory, the time for filing a motion for new trial may not be extended. *See* Tenn. R.Crim. P. 45(b) (specifically excluding time for filing of a motion for a new trial from those time periods which the court may, in its discretion, extend); *see also State v. Martin*, 940 S.W.2d 567, 569 (Tenn.1997); *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn.Crim.App. 1989). The thirty-day provision is jurisdictional, making the trial court's erroneous consideration of an untimely filed motion a nullity and preventing the defendant from raising on appeal any issues which should have been raised in the motion for a new trial. *Martin*, 940 S.W.2d at 569; *Dodson*, 780 S.W.2d at 780. Unlike the untimely filing of the notice of appeal, this Court does not have the authority to waive the untimely filing of a motion for new trial. *State v. Givhan*, 616 S.W.2d 612, 613 (Tenn.Crim.App.1980); *see also* Tenn. R.App. P. 4(a).

In order to determine the timeliness of the Defendant's motion for a new trial, we must determine if it was filed "within thirty days of the date the *order of sentence* is *entered.*" Tenn. R.Crim. P. 33(b) (emphasis added). The Tennessee Criminal Sentencing Reform Act of 1982 contemplates the entry of a "judgment document," fol-

lowing the pronouncement of sentence by the trial court. *See* Tenn.Code Ann. § 40–35–209(e); *see also State v. Timothy Beshea*, C.C.A. No. 68, 1987 WL 7185, at *2 (Tenn.Crim.App., Knoxville, Mar. 2, 1987) (Jones, J., concurring). The Act further authorizes the Supreme Court to "promulgate a uniform judgment document for use by the trial judges." Tenn.Code Ann. § 40–35–209(f); *see also Beshea*, 1987 WL 7185, at *2. Accordingly, Tennessee Supreme Court Rule 17 states in pertinent part as follows:

The judgment document shall be in the form provided and shall contain all of the information required by T.C.A. § 40–35–209(e). The judgment should be prepared for each conviction; if there are multiple convictions in the same indictment, separate judgments should be filled out with appropriate notations stating whether the sentences will run consecutively or concurrently. The date of the judgment shall be the date upon which the order of sentence was entered.

█ There are nineteen categories of information which must be contained in every judgment document, most of which relate to a defendant's sentence. *See* Tenn.Code Ann. § 40–35–209(e). The preparation and filing of a judgment document is mandatory. *Id.; see also Beshea*, 1987 WL 7185, at *2.

Prior to the institution of a uniform judgment document, judgment upon the verdict and the order of sentence were not required to be—and often were not—contained within one document. Following institution of the uniform judgment

that the judgment form is the relevant document for Rule 33 purposes.

**3.** We note that the Tennessee Rules of Criminal Procedure were revised on July 1, 2006. *See* Compiler's Notes, Tenn. R.Crim. P.

(2006). These revisions made some slight language changes to the sections cited and quoted herein. For purposes of this opinion, because the substance of the rules under review have not changed, we will cite to the rules in their current forms.

document, trial courts were required to enter a uniform judgment document for each affected conviction and set forth the sentence for each conviction. As such, based upon the required contents of the mandatory uniform judgment document, we conclude that the order of sentence is contained within the uniform judgment document.

The State acknowledges that the judgment document was not filed until September 10, 2004, but relying on *Willie Calvin Taylor v. State,* No. W2005–01495–CCA–R3–PC, 2006 WL 2663758 (Tenn.Crim. App., Jackson, Sept. 15, 2006), contends that "the thirty-day period extends from the date the [D]efendant is sentenced, not when the clerk files the order." The Defendant contends that "a court speaks only through its minutes" and, thus, the relevant date is the minute entry.

In *Taylor,* a panel of this Court concluded that the post-conviction statute of limitations started thirty days after the date the petitioner's sentence was pronounced, not when the judgment form was entered and, therefore, the petition for post-conviction relief was not timely filed. 2006 WL 2663758, at *2. In making this determination, the *Taylor* Court relied upon a decision of our supreme court, wherein "our supreme court reviewed the language of Rule 4 and held that 'a judgment of conviction entered upon a guilty plea becomes final thirty (30) days after acceptance of the plea agreement and imposition of sentence.'" *Id.* at *1 (quoting *State v. Green,* 106 S.W.3d 646, 650 (Tenn.2003)). The *Taylor* Court acknowledged that its decision was at odds with another decision by a panel of this Court—*State v. Willie Norman,* No. W2003–02067–CCA–R3–CD, 2004 WL 2255253 (Tenn.Crim.App., Jackson, Oct. 7, 2004), *perm. to appeal denied,* (Tenn. Mar. 7, 2005). In *Norman,* the judgment form was signed by the trial judge on July 15, 2003, the same date on which the defendant entered his plea of guilty. 2004 WL 2255253, at *5. However, the judgment was not filed with the court clerk until July 29, 2003. *Id.* The Defendant filed a notice of appeal on August 23, 2003. *Id.* at *4. The *Norman* Court concluded that the notice of appeal was timely filed, relying on the language of Rule 32(e) of the Rules of Criminal Procedure requiring entry by the clerk and reasoning that "the judgment was entered on July 29, 2003, the date it was file with the trial court clerk." *Id.* at *5.

▌ In this case, there was an oral pronouncement of sentence by the trial court on September 3, imposing an automatic life sentence. *See* Tenn.Code Ann. § 39–13–208(c). However, we conclude that an oral pronouncement of sentence is not entry of the order of sentence for purposes of Rule 33. The rule does not speak in terms of when the sentenced is ordered but rather when the order of sentence is *entered.* Rule 32(e)(1) of Tennessee Rules of Criminal Procedure states, "A judgment of conviction shall be signed by the judge and entered by the clerk." It is our view that the "file-stamp" date provides evidence of when the order of sentence was entered by the clerk. Thus, the effective date for entry of a judgment or order of sentence is the date of its filing with the court clerk after being signed by the judge.

We further note that this opinion is in accord with our supreme court's view expressed in *Graham v. State,* 90 S.W.3d 687 (Tenn.2002). In *Graham,* the Petitioner filed a motion to reopen his post-conviction petition which was denied. 90 S.W.3d at 689. The order denying the motion was signed by the trial judge on December 6, 2000, but it was not filed in the court clerk's office until December 13, 2000. *Id.* The Defendant filed his pro se pleading titled "notice of appeal" in the correctional

facility mailbox on December 21, 2000. *Id.* The relevant statute addressing the timeliness issue in that case was Tennessee Code Annotated section 40–30–217 (1997): "If the motion [to reopen] is denied, the petitioner shall have 10 days to file an application in the court of criminal appeals seeking permission to appeal." In determining that the appeal was filed in a timely manner, the court concluded as follows:

> [W]e choose to borrow the filing framework established by Tenn. R. Civ. P. 58[4] and hold that the ten-day appeal period in Tenn.Code Ann. § 40–30–217(c) begins when the order denying the motion to reopen is filed with the trial court clerk and not when the judge signs the order or the clerk enters it into the minutes.

*Graham,* 90 S.W.3d at 690.

In order to promote fairness, consistency, and uniformity, we agree with the rationale of the courts in *Norman* and *Graham* and conclude that the order of sentence was entered on the date the uniform judgment document was filed with the court clerk—September 10, 2004. To conclude otherwise would permit entry of an order of sentence before it is reduced to writing. Moreover, the entry of an order of sentence could occur before one was drafted and could easily lead to thirty days expiring prior to any written document being filed with the clerk. Therefore, the Defendant's motion for a new trial was timely filed, and we will proceed to address all issues presented by the Defendant.

## II. Jury Selection Process

As his first issue, the Defendant questions the validity of the jury selection process. The Defendant specifically alleges that the Fentress County Circuit Court's deviations from statutorily mandated procedure in selecting the names for jury service resulted in prejudice to him and require that the indictment be dismissed or, at least, a new trial. In this case, "[t]he jury venire for which the trial jury was selected that tried [the Defendant] ... consisted of the jury venires from the regular January 2004 and May 2004 terms of court and, pursuant to the order of the Criminal Court, a special venire drawn on 4 February 2004."

At the motion hearing on May 21, 2004, Mr. Frank Smith, Circuit Court Clerk for Fentress County, testified regarding the jury selection procedures utilized in Fentress County. Usually 100 names were drawn, unless there was "a big case," and then 150 names were drawn. According to the clerk, the names for jury service were compiled by using voter registration records and "the tags[.]" The clerk testified that the names were placed on slips of paper and placed in the jury box. He admitted that the slips of paper did not contain the initials of the jury commissioner who proposed each name and that no well-bound book was maintained to record the master jury list as required by Tennessee Code Annotated section 22–2–302(b). He stated that the names were pulled out of the jury box by a child, that the jury commissioner looked at the name drawn, and that the trial judge then wrote the name on a list.

First, we note that the Defendant complied with Tennessee Code Annotated section 22–2–313, which requires that, before the validity of any verdict can be questioned, any irregularities must be specially pointed out and exceptions taken before the jury is sworn. The Defendant filed a "Motion for Voir Dire Regarding Jury Se-

---

**4.** Tennessee Rules of Civil Procedure 58 provides that, unless otherwise ordered by the court, the effective date for entry of judgment is the date of its filing with the court clerk after being signed by the judge.

lection Process" and, thereafter, raised these issues at the motion hearing on May 21, 2004. The issue of irregularities in the jury selection process was again revisited prior to the jury being sworn.

For each county in Tennessee (except Davidson, Hamilton, and Knox counties), the judge or judges of the circuit court appoint a board of jury commissioners, who with the assistance of a clerk, compile a list of persons suitable for serving on a jury. Tenn.Code Ann. § 22–2–101, – 201(a), –204, –302; *see also State v. Gary Thomas Moore,* No. 01C01–9711–CC–00545, 1999 WL 961383, at *2 (Tenn.Crim. App., Nashville, Oct. 22, 1999). The names to be placed on the list must be in proportion to the population of each district in the county, and the voter registration records cannot be the sole or primary source of names. Tenn.Code Ann. § 22–2–302(a)(1); *see also Moore,* 1999 WL 961383, at *2. The names shall be written on tickets or cards and placed in the jury box. Tenn.Code Ann. § 22–2–302(c)(1). Names for jury service are to be drawn from the jury box in the presence of the jury commissioners and the clerk. *Id.* § –304. After the names are selected, the clerk provides the names to the sheriff so that the venire can be summoned for jury duty. *Id.* § –305; *see also Moore,* 1999 WL 961383, at *2. The clerk is required to publish the jury list five days before the term of court. Tenn.Code Ann. § 22–2–306 (applies to all counties except Davidson and Hamilton, which require publication as soon as the panel has been summoned and selected); *see also Moore,* 1999 WL 961383, at *2. The list is published by posting a copy in the clerk's office for public inspection and by making copies available for distribution. Tenn.Code Ann.

§ 22–2–306; *see also Moore,* 1999 WL 961383, at *2.

■ Generally, before a criminal defendant may successfully challenge an indictment or venire because of improper jury selection procedures, he must show that he was prejudiced or that the improper procedures resulted from purposeful discrimination or fraud. *See State v. Coleman,* 865 S.W.2d 455, 458 (Tenn.1993); *State v. Elrod,* 721 S.W.2d 820, 822 (Tenn.Crim. App.1986); Tenn. R.Crim. P. 52(a)). However, our supreme court has held that "proof of actual prejudice is not required in circumstances . . . when the deviation is flagrant, unreasonable, and unnecessary." *State v. Lynn,* 924 S.W.2d 892, 898 (Tenn. 1996); *see also State v. Bondurant,* 4 S.W.3d 662, 670 (Tenn.1999) (both cases involving deviations in the procedure for selecting special venires). "In both *Lynn* and *Pat Bondurant,* because the deviations were substantial, flagrant and unnecessary, they were an affront to the judicial process and resulted in reversals even though no specific prejudice had been shown." *Moore,* 1999 WL 961383, at *5.

The Defendant claims that the following practices in selecting the venires for his trial substantially departed from mandated statutory procedures.[5] We will address each in turn.

## A. Vacancies on the Board of Jury Commissioners

The Defendant complains that "[t]he membership of the Fentress County Board of Jury Commissioners was deficient at the time of selection of the . . . jury venires chosen for trial of the captioned matter in that one jury commissioner was deceased and another had moved out of the State of

---

**5.** Additional complaints regarding irregularities in the jury selection process were raised in the affidavits of defense counsel submitted

at trial. However, our review is limited to the venire issues specifically presented on appeal.

Tennessee." *See* Tenn.Code Ann. § 22–2–201(b) (requiring that "[t]he board of jury commissioners for each county shall consist of three (3) discreet persons"). This deficiency "resulted in a failure to constitute a quorum during any possible meetings[—for selection of names for the master jury list held pursuant to Tennessee Code Annotated section 22–2–302(a)(1)—]that may have been called after the vacancies occurred."

The Defendant challenges the selection of the venires because there was only one active jury commissioner, Mr. Lonnie Choate, when the names for jury service were selected. The court clerk confirmed that, when the jury venires were chosen for the Defendant's trial, one jury commissioner was deceased and the other no longer resided in Fentress County. Nonetheless, it is apparent from the record that the trial judge, the court clerk, and Mr. Choate were present when the names were drawn for the jury venires. The court clerk testified that, after the names were removed from the jury box, the jury commissioner looked at the name and the trial judge wrote the name down. "The mere fact there was only one jury commissioner did not constitute a violation of the statute." *State v. Robinson*, 971 S.W.2d 30, 41–42 (Tenn.Crim.App.1997). Similarly, our supreme court has stated that "the fact that a jury commissioner may not have selected a tentative list of jurors in the presence of other commissioners, *see* T.C.A. § 22–2–302(a)(1), is not, without more, grounds to quash the venire." *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989).

**B. Appointments and Oaths**

■ The Defendant makes the following arguments regarding the appointments and oaths of the commissioners and clerk. None of the board members had subscribed to the oath of office. *See* Tenn. Code Ann. § 22–2–203(a) (stating that

"each member of the board of jury commissioners shall take and subscribe ... the following oath"). Neither the oaths or appointments of the jury commissioners were spread upon the minutes of the court. *See id.* at (b)(1) (requiring that "[t]he appointment and oath shall be spread upon the minutes of the circuit court and upon the minutes of the criminal court in the counties where such court is held"). The clerk of the board of jury commissioners had not subscribed the oath of office. *See id.* § –204 (stating that "the clerk of the circuit court shall take and subscribe ... the following oath").

■ This Court has previously held that "the provision for spreading the oaths of jury commissioners on the minutes is directory and failure to enter them, if the commissioners are otherwise qualified, does not invalidate the actions of a grand jury." *Moore*, 1999 WL 961383, at *3 (citing *Bollin v. State*, 486 S.W.2d 293, 295 (Tenn.Crim.App.1972)). It is well settled that " 'one legally appointed to an office without qualifying by taking the oath or otherwise is an officer and his official acts will be valid as to the public and all third persons.' " *Id.* (quoting *Bollin*, 486 S.W.2d at 295). Because the "offended rules were directory and the commissioner [ ] and the clerk were otherwise qualified," their official actions were not invalid. *Id.* "[T]he mere fact that irregularities occurred in the process of qualifying and certifying jury commissioners does not impugn the venire selection process." *Id.* at *5.

**C. Venire Composition**

■ The Defendant argues that the names for the master jury list were not selected from each district in proportion to the population of such districts. *See* Tenn. Code Ann. § 22–2–302(a)(1). The Defendant further states that, because no well-

bound book had been purchased, there was "no method to ensure any jury commissioner select[ed] persons for the venire proportionately to the districts of the county." He also alleges that he was prejudiced because the court clerk caused "the selection of [a] sufficient venire [of] men to overwhelm the challenges allotted to his counsel in the pre-trial jury voir dire."

■■■ Defendants are constitutionally entitled to a venire which represents a fair cross-section of the community. *Moore,* 1999 WL 961383, at *3 (citations omitted). Contrary to the Defendant's assertions, the failure to maintain a well-bound book would not have precluded him from offering proof in support of this allegation. No proof was offered regarding the population figures of Fentress County or the residency breakdown of the prospective jurors. *See id.* During the May 21 hearing, most of the time was devoted to the operational procedures for selection of the venires for the Defendant's trial. The Defendant failed to establish the number of persons selected from each district and failed to show that the selection in any district was disproportionate. Accordingly, we conclude that the Defendant has failed to establish his claim that venire composition did not represent a fair cross-section of the community.

## D. Operational Deviations

■■■ We next address the Defendant's complaints about the operational deviations in selecting the venires. First, the Defendant notes "the absence of meetings of the bi-annual jury commission selection of the jury venires in this case...." *See* Tenn.Code Ann. § 22–2–302(a)(1) ("The board of jury commissioners shall meet in the circuit court clerk's office at a time fixed by the judge or judges appointing the board, and ... every two (2) years thereafter, and shall ... select ... a list of names of ... persons ... to serve as

jurors ... for the ensuing two (2) years."). Furthermore, the Defendant asserts that "[n]o minutes of the meetings of the jury commissioners exists in regard to their bi-annual selections of the members of the citizens of the county to serve as jurors."

Second, he alleges that the clerk failed to record the master jury list in a well-bound book. *See* Tenn.Code Ann. § 22–2–302(b)(1) (requiring that "[t]he circuit court clerk as clerk of the board shall purchase a suitable and well-bound book in which to record the list"), (c)(2) (stating that "[t]he jury book shall be kept in secret by the clerk under lock and key"). Because there was no master jury list, the initials of the jury commissioner proposing each name did not appear next to the name on the master list, and names were not approved by a majority vote of the board. *See id.* at (b)(3) (requiring that, "[a]fter each name [put on the list,] there shall be placed in parentheses the initials of the commissioner proposing such name, but no name shall be placed on such list except by a majority vote of the board"). Finally, the jury commissioners did not certify and preserve the master list. *See id.* at (b)(4) (requiring the "signatures of the jury commissioners and a specific written certification at the end of the list").

Third, the Defendant contends that the jury box was not kept under seal and that there was a "lack of ... proof the box could be securely locked from the intrusion of unauthorized persons...." *See* Tenn. Code Ann. § 22–2–302(c)(1) (calling for the jury box "to be kept securely locked and under seal"). The uniform tickets placed in the jury box did not contain the initials of the commissioner who proposed each name. *See id.* (stating that "[t]he names on the list preceded by the original number thereof and followed with the initials in parentheses of the commissioners who proposed each name shall be written by the

clerk on tickets or cards of paper uniform in size, and placed in a box"). The names on the list were not placed in the jury box in the presence of the jury commissioners. *See id.* (requiring that "names on the list ... shall be ... placed in [the jury] box ... in the presence of the commissioners"). Moreover, the jury commissioners did not certify that the list of names drawn from the jury box was accurate. *See id.* § –304(a)(5)(A) ("Not more than five (5) days before nor later than the first day of such regular or special term of court, the board shall certify that the names drawn constitute the regular panel of grand and petit jurors for such term of court."). Also, the Defendant points out that "[t]here are no records produced of the jury box being unlocked or its seal broken for any purpose." *See id.* § –302(c)(1)

> (the jury box shall not be unlocked or the seal broken except by the order of and in the presence of the board and the clerk, and then only for the purpose of refilling the box or drawing therefrom the names of jurors for jury service, or in open court by order of the judge holding court for good and sufficient cause, or by order of the judge holding court as hereinafter provided.)

Fourth, the Defendant argues that the trial judge did not notify the jury commissioners in writing before the time for drawing the names from the jury box. *See* Tenn.Code Ann. § 22–2–304(a)(2) ("It is the duty of the judge of such court to notify the board in writing before the time for drawing the panel of the number of names which shall be drawn for such term of court.").

Fifth, the Defendant submits that the court clerk neither prepared, delivered to the court, nor retained a copy of a report, signed by the jury commissioner, that listed the numbered and initialed names drawn from the jury box. *See* Tenn.Code Ann. § 22–2–304(d)(1) (the clerk shall pre-pare a report "to the court signed by the commissioners, a copy of which shall be retained by the clerk for use under the provisions of this chapter").

Finally, he notes that the court clerk failed to properly post or make public the jury list. *See* Tenn.Code Ann. § 22–2–306(b)

> ([F]ive (5) days prior to the appropriate term of court, the clerks of the criminal and circuit courts or the jury commissioners shall publish a true copy of the regular jury panel list.... In addition thereto, the clerks of the criminal and circuit courts or the jury commissioners shall cause to be made a sufficient number of copies of such jury panel list, which copies shall be placed in the clerk's office and available for general distribution).

In response to these allegations, the State submitted the affidavit of the court clerk at the motion for new trial hearing. In the affidavit of the court clerk, the clerk states as follows:

> It has long been the practice in Fentress County approved by the [c]ircuit and [c]riminal [j]udge that the names used to fill the jury box are compiled from the voter registration lists and the list of registered owners of motor vehicles obtained from the [c]ounty [c]ourt [c]lerk. These lists are tabulated and arranged so that names can be selected directly therefrom. Slips of names and addresses from these lists are placed in the jury box from which the individual jury venires are drawn. The jury commissioners do not individually pass on the qualifications of the names placed in the jury box. As a result of the use of this method pursuant to Tennessee Code Annotated § 22–2–302(d), no well-bound jury book is kept of the master jury list.
>
> The jury box is kept in the [c]lerk's vault and is locked. Only I have posses-

sion of the key to the box; and during my service as [c]lerk it has only been opened in the presence of the jury commissioners except on a few occasions when it was opened in the presence of the [c]riminal [j]udge in order for him to draw a special venire.

When a jury venire is selected for [g]rand and [p]etit [j]urors by properly drawing the slips with the names and address from the jury box, jury commissioners only then exclude jurors if the person has died, removed from the county, or become mentally or physically disabled. After the names are drawn, the jury venire is prepared and the slips are placed in an envelope and presented to the [c]ourt at the beginning of the court term.

The court clerk also stated, "Although these and other jury venires are not posted in my office[, c]opies of venires are available upon request and are regularly provided to attorneys and other citizens."

The statements of the court clerk appear to be an attempt to meet the requirements of Tennessee Code Annotated section 22–2–302(d). This section provides as follows:

In any county of this state, if a majority of the circuit and criminal law judges and chancellors holding court in the county finds that the tax records and permanent registration records of the county, and records or lists of persons eighteen (18) years of age and older residing in the county who are licensed to drive, or other available and reliable sources, are so tabulated and arranged that names can be selected therefrom by mechanical or electronic means in such manner as to assure proportionate distribution of names selected without opportunity for the intervention of any human agency to select a particular name, then and in that event, such judges and chancellors may authorize the jury com-

mission to obtain names for jury venires from such source and by such method. Tenn.Code Ann. § 22–2–302(d).

The court clerk states that the county's practices in jury selection have been "approved" by the judges of Fentress County. Even if we were to find compliance with section 22–2–302(d), several other practices admittedly deviate from the command of the statutes. Nonetheless, we conclude that these deviations, though unnecessary, are not flagrant. "It does not approach the degree of deviation described by the supreme court in *Lynn* or *Bondurant* .... Certainly, there has been no total disregard of the prescribed procedures. Consequently, the [D]efendant is not excused from establishing prejudice...." *Moore*, 1999 WL 961383, at *7.

The Defendant argues that these cumulative statutory irregularities lead to a "grievous wrong to the administration of justice" and cannot be considered harmless. The Defendant further alleges fraud on the part of the circuit court clerk:

Mr. Smith used his authority as [c]ircuit [c]ourt [c]lerk and as the [c]lerk of the Fentress County Jury Commission to manipulate the selection of the special jury venires to suit his purpose of avenging the incarceration of his uncle for the uncle's conviction of the murder of the [Defendant's] brother by manipulating the incarceration of the [Defendant] through his absolute control of the jury selection process in Fentress County.

The court clerk responded as follows:

In 1949, Hollis Beaty, my uncle, did kill Dillard Stephens, an older brother of [the Defendant], for which he was convicted of [f]irst [d]egree [m]urder. At the time of the homicide, I was eight years old and living in Tacoma, Washington. Within a year, my family returned to Fentress County. As an ado-

lescent and teenager, I had frequent contact with [the Defendant]. He often visited our home. None of my family nor I ever expressed or held any animosity toward [the Defendant] as a result of the homicide. He was not involved in anyway in that incident. The homicide did not influence my official actions or duties in the trial of [the Defendant] in any manner.

We agree with the State that the Defendant does not explain how this "feud" influenced a single member of the jury. At the motion hearing, the trial court noted,

I need to know where the prejudice is or how this·is somehow creating a major problem for Fentress County courts.... We'll just go downstairs and I'll see what we do, and if there's—if I think that we need to tighten up something, we'll tighten it up, but I'm not just gonna assume that if we didn't follow it book and verse that we've got a jury problem, you know.

Prior to the swearing of the jury, the issue was again addressed, and the trial court ruled as follows:

I do—there may be technical flaws—practical flaws that have occurred over the years, but the [c]ourt is familiar with this process as I am in all five counties in this district. And the [c]ourt is going to find that the [c]lerk is in substantial compliance with the statute in the area of forming the venire, gathering the names that we—we. go through.... We know from whence the list comes from and we know how they are selected. And if there are—if there are errors, they are not material errors in the [c]ourt's mind, and therefore, I'm going to find that the [c]ounty [c]lerk's office is in substantial compliance in the impanelling [sic] of the jury and overrule any motion for—or any remedy that you seek at this point.

The trial court correctly rejected the Defendant's claim. The Defendant has failed to establish prejudice resulting from the trial court's deviations from mandated statutory procedure in the jury selection process.

Like the court in *Moore*, we take this opportunity to encourage the Fentress County Circuit Court to review the jury selection process as authorized by Tennessee Code Annotated section 22–2–310. *See Moore*, 1999 WL 961383, at \*7. Although the violations do not rise to the level of "being prejudicial to justice," they should be corrected. *See id.*

### III. Polling the Jury

Next, the Defendant argues the trial court erred in its method of polling the jury. After the jury returned its verdict of guilty, the trial court sua sponte polled the jury by requesting the jurors to raise their hands: "Is that the collective judgment of the entire [j]ury? If it is, signify by raising your right hand. The [c]ourt notes that all the jurors are agreeing with [the jury foreman's] announcement." The Defendant asserts that the trial court should have polled the jurors individually and orally as to the verdict of guilty. The State responds that the issue is waived because the Defendant failed to make a contemporaneous objection to the trial court's method of polling the jury and that, regardless of any waiver, the Defendant has failed to demonstrate prejudice.

Tennessee Code Annotated section 20–9–508 provides for polling of the jury when requested by a party: "The trial judges in all courts of record in which suits are tried by juries, in both criminal and civil cases, shall be required to poll the jury on application of either the state or the defendant in criminal cases and either the plaintiff or the defendant in civil cases, without excep-

tion." Rule 31(e) of the Rules of Criminal Procedure provides as follows:

> After a verdict is returned but before the verdict is recorded, the court shall—on a party's request or on the court's own initiative—poll the jurors individually. If the poll indicates that there is not unanimous concurrence in the verdict, the court may discharge the jury or direct the jury to retire for further deliberations.

The State is correct that the Defendant did not request that the jury be polled and did not object to the method of polling. We conclude that he waived, by his failure to object or request that the jury be polled, any question about the verdict. *See Rice v. State,* 4 Tenn.Crim.App. 600, 475 S.W.2d 178, 180 (1971) (citing *Nance v. State,* 210 Tenn. 328, 358 S.W.2d 327, 337 (1962)); *see also* Tenn.Code Ann. § 20–9–508 note 9.

 Irregardless of waiver, we conclude that the trial court did not abuse its discretion in its polling method. The trial court, on its own motion, polled the jury. "[A] trial courts method of polling the jury is subject to an abuse of discretion standard." *State v. Clayton,* 131 S.W.3d 475, 478 (Tenn.Crim.App.2003). The *Clayton* Court initially noted that,

> [i]n Tennessee civil cases, no particular method of polling a jury is mandated; thus, it rests within the trial court's discretion to determine the manner of polling the jury. *See Dixon Stave & Heading Co. v. Archer,* 40 Tenn.App. 327, 291 S.W.2d 603, 608 (1956). Correlatively, Tennessee appellate courts have stated that "no particular form of answer is essential on the polling of a jury, it being sufficient if the answer of the juror ... indicates with reasonable certainty that the verdict is his [or her] own." *Id.* at 609; *see also Davis v. Wilson,* 522 S.W.2d 872, 883 (Tenn.Ct.

App.1974); *Smith v. Weitzel,* 47 Tenn. App. 375, 338 S.W.2d 628, 638 (1960).

*Id.* at 479. The *Clayton* Court further observed that, "[a]s in the case of jury voir dire, '[t]he trial court has the opportunity to both visually and auditorially observe the demeanor of ... jurors ..., and accordingly, evaluate their credibility.'" *Id.* at 479 (quoting *State v. Keen,* 31 S.W.3d 196, 228 (Tenn.2000) (appendix)).

The record reflects that each juror affirmatively indicated that the verdict was his or her own individual verdict. *See State v. Anthony D. Brown,* No. W2005–00199–CCA–R3–CD, 2006 WL 51357, at *3 (Tenn. Crim.App., Jackson, Jan. 10, 2006) (concluding that polling the jury by observing nodding of the juror's heads was not an abuse of discretion), *perm. to appeal denied,* (Tenn. May 30, 2006). Based on our review, we conclude that the trial court did not abuse its discretion in the manner in which it conducted the polling process. Moreover, any error in this regard would be harmless.

### IV. Order of Testimony

 The Defendant argues that the trial court committed prejudicial error by not requiring Detective Gary Ledbetter to testify as the first witness for the State. On May 6, 2004, the Defendant filed a "Motion to Require Order in Testimony" requesting that Det. Ledbetter be required to testify "first or not all." Detective Ledbetter was the State's designated representative pursuant to Tennessee Rule of Evidence 615. The trial court overruled the Defendant's motion and stated,

> If I see a problem developing—for instance, if I—and I can see what you're concerned with. You're concerned with Mr. Ledbetter going last and maybe cleaning up matters. If I thought we were getting into overly housekeeping matters, you know, cleaning up State

problems and that kind of thing, I might—I certainly would entertain objections, but I don't think that there is anything inherently wrong with the prosecutor remaining in the [c]ourtroom and testifying last if that's how the State wants to go.

Rule 615 of the Tennessee Rules of Evidence provides as follows:

At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

The advisory commission comment to the 1997 amendment to Rule 615 provides as follows:

The second change modifies the second category of persons not sequestered. A "party that is not a natural person" includes, among other entities, a corporation and the State of Tennessee. Consequently, the prosecuting attorney could designate a crime victim, a relative of the crime victim, or an investigating officer. Like category (1), category (2) is a matter of right. Category (3), in contrast, is a matter of judicial discretion.

In accordance with the advisory commission comment, we conclude that Detective Ledbetter, the investigating officer in this case, was properly permitted to remain in courtroom as the State's designated representative. Thus, we must determine if he should have been required to testify as the State's first witness.

The Defendant relies on *Smartt v. State*, 112 Tenn. 539, 80 S.W. 586 (1904), and *Mothershed v. State*, 578 S.W.2d 96 (Tenn. Crim.App.1978), in support of his contention the Det. Ledbetter should have been made to testify first. In the recent opinion of *State v. Timmy Reagan*, No. M2002–01472–CCA–R3–CD, 2004 WL 1114588 (Tenn.Crim.App., Nashville, May 19, 2004), this Court addressed this issue and concluded that the witness should be required to testify first:

In fact, this court has cited *Smartt v. State*, 112 Tenn. 539, 80 S.W. 586, 588 (1904), for requiring the prosecuting witness to testify first and has commented that the rule in *Smartt* was a reasonable limitation on the then-existing statutory provision exempting parties from the rule of sequestration. *Mothershed v. State*, 578 S.W.2d 96, 100–01 (Tenn. Crim.App.1978). We note that the statute was repealed in 1991 and replaced by Rule 615, Tenn. R. Evid. *See* T.C.A. § 24–1–204 (repealed 1991).

. . . .

We do not believe that Rule 615 affects *Smartt's* requirement that the state's designated person testify first. We note, though, that *Smartt* was decided when a testifying defendant was statutorily required to be the first witness for the defense. *See Clemons v. State*, 92 Tenn. 282, 21 S.W. 525 (1893). The rule in *Smartt* created a symmetry by preventing either party from having the

advantage of a witness being able to conform his testimony with that of other witnesses. *See Brooks v. State,* 406 U.S. 605, 611, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972). That symmetry was ended in *Brooks* when the United States Supreme Court held that making the defendant testify first or not at all violated the defendant's right against self-incrimination and right to due process. *Id.* 406 U.S. at 611 n. 5, 92 S.Ct. 1891.

Although the defendant no longer need testify first, we believe the *Smartt* rule generally remains in effect as shown in *Mothershed.*

*Reagan,* 2004 WL 1114588, at *17–18.

The Defendant contends that he was prejudiced by this error because Det. Ledbetter was "permitted to 'clean up' the [S]tate's perceived weakness in its investigation and preservation of the crime scene." However, the Defendant has not specified anything about Det. Ledbetter's improperly changing his testimony while hearing other witnesses testify. *See Reagan,* 2004 WL 1114588, at *18 (citing *State v. Sexton,* 724 S.W.2d 371, 374 (Tenn.Crim. App.1986) (holding that, without evidence that detective changed testimony after hearing other witnesses, failure to testify first did not affect the results)). Like the court in *Smartt,* we also conclude that no "substantial injury was done to the defense ... in the court below by such action ... [and therefore] it cannot be treated as reversible error in the present case." *Smartt,* 80 S.W. at 588. In other words, the Defendant has not shown prejudice and is not entitled to relief.

## V. Sufficiency of the Evidence

As his final issue, the Defendant argues that the evidence is insufficient to support his conviction for first degree murder. Specifically, he states that "[t]his Court should invade the province of the jury and assess the credibility of the [S]tate's witness, Harvey Stowers, and reject the testimony of this witness.... The only person the [S]tate could produce who could testify about the [Defendant] and the missing twelve-gauge shotgun was the witness Harvey Stowers."

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. *See State v. Evans,* 108 S.W.3d 231, 237 (Tenn.2003); *State v. Carruthers,* 35 S.W.3d 516, 557–58 (Tenn.2000); *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn.1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Hall,* 8 S.W.3d 593, 599 (Tenn.1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *See Carruthers,* 35 S.W.3d at 558; *Hall,* 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. *See State v. Bland,* 958 S.W.2d 651, 659 (Tenn.1997). Questions about the credibility of witnesses, the

weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. *See Evans,* 108 S.W.3d at 236; *Bland,* 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. *See Evans,* 108 S.W.3d at 236–37; *Carruthers,* 35 S.W.3d at 557.

The Defendant was convicted of first degree murder, which is defined as the "premeditated and intentional killing of another." Tenn.Code Ann. § 39–13–202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." *Id.* at (d). To be premeditated, the intent to kill must have been formed before the act itself, and the accused must be sufficiently free from excitement and passion. *Id.* An intentional act requires that the person have the desire to engage in the conduct. *See id.* § 39–11–106(a)(18). Whether premeditation is present is a question of fact for the jury, and it may be determined from the circumstances surrounding the offense. *Bland,* 958 S.W.2d at 660; *State v. Anderson,* 835 S.W.2d 600, 605 (Tenn.Crim.App.1992).

Although a conviction may be based entirely upon circumstantial evidence, *Duchac v. State,* 505 S.W.2d 237, 241 (Tenn.1974), in such cases, the facts must be "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Black,* 815 S.W.2d 166, 175 (Tenn.1991) (citing *State v. Duncan,* 698 S.W.2d 63 (Tenn.1985)). However, as in the case of direct evidence, the weight to be given circumstantial evidence and "the inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *Marable v. State,*

203 Tenn. 440, 313 S.W.2d 451, 457 (1958) (citations omitted).

In this case, the Defendant's sufficiency argument is based upon the credibility of Harvey Stowers, the owner of Harvey's Pawn Shop and the man who sold the Defendant a twelve-gauge shotgun that was not recovered during the investigation. The Defendant asserts that Mr. Stowers' testimony is "impossible to reconcile [with] the physical evidence" presented at trial:

Mr. Stowers' admission that the BATF Firearm Purchase Form 4473 was completed contrary to the specific instructions printed plainly on the form should have been the first alert of witness credibility.

Mr. Stower's testimony that he completed the form in total disregard of the instructions contained in the body of the form itself regarding the sale of a firearm to an illiterate person, incorrectly filling in the blank spaces in the form, the glaringly egregious error on the [p]atent [p]ending number being substituted for the serial number of the shotgun, and most especially the fact that the *three* different examples of his signature that appear on exhibits in the record of this case bear absolutely no similarity to each other.

Although the Defendant focuses on the evidence presented by Harry Stowers in his sufficiency argument, other evidence presented at trial was consistent with the jury's guilty verdict. For example, it was established that the Defendant was quite familiar with the Crossroads community and that he had often been seen walking in this area. The Defendant was divorced from Pearl Rozanski, who lived next door to the victim, and the victim often assisted Ms. Rozanski with household chores. Prior to the murder, Mrs. Conaster had observed the Defendant "peeping" over at her house. On the day of the murder, Mr. Russell encountered the Defendant at 7:40

a.m. walking near two routes that lead up to the Rozanski and Conaster homes. The murder occurred sometime between 8:30 a.m. and 9:20 a.m. After 10:00 a.m., Mr. Murphy picked up the Defendant near the ten-mile marker on Highway 52, a location near a trail leading from the victim's home. Just following the murder, the Defendant's sisters were in the area inquiring about the Defendant's whereabouts.

The ammunition found in the Defendant's home was consistent with the "unusual" combination of "power piston wads" and "double aught buckshot" found at the crime scene. Mr. Stowers testified that he sold the Defendant a twelve-gauge shotgun in October of 1998, which was never recovered by law enforcement. The Defendant denied being in the area of the murder when questioned by law enforcement.

The Defendant asks this Court to discount the testimony of State's witness Harvey Stowers based upon credibility issues. However, as noted above, this Court will not re-weigh or re-evaluate the evidence. *See Evans*, 108 S.W.3d at 236. Furthermore, questions about the credibility of witnesses, the weight and value of the evidence, as well as factual issues raised by the evidence are to be resolved by the trier of fact. *Id.* Accordingly, we conclude that the evidence submitted at trial was legally sufficient for a rational trier of fact to find the Defendant guilty of first degree murder beyond a reasonable doubt.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.