# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs June 26, 2012

## STATE OF TENNESSEE v. JOSHUA PAUL LEWIS

**Appeal from the Criminal Court of Cumberland County**
**No. 10-0008     Leon C. Burns, Jr., Judge**

---

**No. E2011-02377-CCA-R3-CD - Filed September 26, 2012**

---

The Defendant, Joshua Paul Lewis, was convicted by a jury of two counts of rape of a child and one count of attempted rape of a child. The trial court subsequently sentenced the Defendant to twenty-five years on each of the rape convictions and to ten years on the attempted rape conviction, all sentences to run concurrently, for an effective sentence of twenty-five years in the Department of Correction. In this direct appeal, the Defendant contends that (1) the trial court erred in denying his motion to suppress his statement to the police; (2) the trial court erred in denying his motion for judgment of acquittal due to variances between the bill of particulars and the proof at trial; and (3) he was denied a fair trial due to cumulative error. After a review of the record and relevant authorities, we have determined that the Defendant's issue are waived for failing to preserve them in a timely-filed motion for new trial. Accordingly, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Matthew Edwards, Crossville, Tennessee, for the appellant, Joshua Paul Lewis.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Randy York, District Attorney General; and Gary McKenzie and Amanda Hunter, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

The Defendant was indicted in January 2010 for two counts of rape of a child and one count of attempted rape of a child. Each count involved the same victim, a male born on

April 29, 2000.[1]  Each count alleged that the crime was committed "on a specific day between May 1, 2009 and July 31, 2009, in Cumberland County, Tennessee."  In May 2010, the defense filed a motion for a bill of particulars requesting the "exact time and date of" each offense and the "exact location" of each offense.  The State responded that the offense alleged in Count 1 occurred "[b]etween the dates of May 1, 2009 and July 31, 2009" and took place at the "Cumberland Mountain State Park, Cumberland County TN."  The response gave the same description of the "time and date" as to Counts 2 and 3.  The location of the crime alleged in Count 2 was described as the "residence of Valerie D[.] at 940 Old Highway 70, Crossville, TN."  Finally, the response described the location of the crime alleged in Count 3 as "OakLawn Cemetery Pomona, POW Camp Road, Cumberland County TN."

Also prior to trial, the defense filed a motion to suppress the Defendant's statement to the police.  At the ensuing hearing, Investigator Jeff Slayton with the Cumberland County Sheriff's Department testified that he was one of the officers who interviewed the Defendant on December 9, 2009.  He identified an "Admonition and Waiver and Waiver of Rights" document bearing the same date and signed by the Defendant.  The document also indicates a time of 9:07 p.m.  This document was subsequently admitted into evidence.

Investigator Slayton stated that, earlier that day, he had been in a "lengthy . . . vehicle pursuit" of the Defendant.  During the Defendant's apprehension, he was pepper-sprayed at some time late in the afternoon, but before 6:00 p.m.  Investigator Slayton stated that he had been pepper-sprayed as part of his training and that the effects last from thirty to forty-five minutes.

Investigator Slayton interviewed the Defendant together with Investigator Chad Norris.  A "DCS" agent, whose name he could not remember, was also present.  The interview took place in the training room of the justice center.  The Defendant was in custody at the time.

Investigator Slayton read the Admonition and Waiver to the Defendant, and the Defendant then read the Waiver of Rights out loud.  According to Investigator Slayton, the Defendant had no trouble reading the document.  The Defendant did not complain about being unable to read because of the pepper-spray.  After the Defendant had read the Waiver of Rights out loud, he signed it.  Investigators Slayton and Norris both witnessed the Defendant's signature.

Investigator Slayton proceeded to question the Defendant about the pursuit.  He also questioned him about the instant allegations, of which Investigator Slayton had just learned.

---

[1] It is the policy of this court not to identify by name the victims of sex crimes.

At no time did he promise the Defendant a lower bond if he confessed to the sex offense charges. After Investigator Slayton finished his oral interview of the Defendant, Investigator Norris reduced the Defendant's statement to writing.

On cross-examination, Investigator Slayton maintained that the Defendant's eyes were not "irritated" during the interview and that the Defendant had been able to look at and focus on Investigator Slayton. He also maintained that the Defendant was "calm" and "understanding" while the Admonition and Waiver was read to him. Investigator Slayton described this information as the Defendant's Miranda rights. The Defendant did not have on handcuffs, but Investigator Slayton did not remember if the Defendant had on leg-shackles. According to Investigator Slayton, there was no audio-recording of the interview.

Investigator Chad Norris with the Cumberland County Sheriff's Department testified that he witnessed the Defendant sign the Waiver of Rights. He also stated that he reduced the Defendant's statement to writing. He identified the document and explained his process for creating it:

> The way I do my statements is, I will write a portion of it, after what they've told me what they want to say, I'll write their words and I'll read back what I've wr[itten]; and then I'll continue on with it, write a small – another portion of it, read it back, and all the time asking them, "Is this what you want me to say? Is this correct?" And I do that throughout the whole statement. Then I give them the statement and have them read over it.

Investigator Norris confirmed that he followed this process with the Defendant's written statement. He then read the statement into the record[2]:

> I had several sexual contacts with [the victim] after he came on to me. I touched his penis several times, I'm not sure exactly how many times. He played with my penis several times as well. I never came/ejaculated while he played with my penis. When it first started we were both into it, but in the later part of the relationship [the victim] was more into it than me. I gave him a blow job more than one time, but I'm not sure exactly how many times. Most of the sexual acts occurred at Valerie D[]s' house on Old Highway 70. On one occasion while at the cemetery on POW Camp Rd not too far from Valeries's house [the victim] wanted to have sex in Valerie's van. He got in the back seat and took his pants off. He had his legs raised up and I had my pants unzipped with my penis out. I had a condom on and was about to put my

---

[2] A copy of the Defendant's statement was also admitted as an exhibit to the hearing.

penis in his butt, but decided [to] stop before we had intercourse. At a house on Old Mail Road where I was doing work me and [the victim] laid on top of each other, but nothing happened there. I wish these things hadn't happened and I would take them back if I could.

Investigator Norris testified that the Defendant signed this written statement at 10:45 p.m. He also testified that he did not promise the Defendant a lower bond if he confessed to these crimes.

On cross-examination, Investigator Norris stated that it was "typical" for him to write a suspect's statement. Investigator Norris also affirmed that the Defendant had been taken into custody on unrelated charges. He stated that he had previously interviewed the Defendant on the instant charges on August 11, 2009, in the Defendant's driveway. He did not obtain a statement from the Defendant on that day.

The Defendant testified at the suppression hearing that he had run from the police on December 9, 2009, because he had been told they were going to beat him up. He also stated that he "remember[ed] getting beat up by most of the sheriff's department and maced a couple of times." His eyes were burning, and he tried to rinse them with water, but "that made it a hundred times worse." He did not remember at what time he was sprayed because he "was on Xanax," but he stated that it was "dark out." He described the sensation of being sprayed as "someone was jabbing a knife in [his] eye."

When asked about the interview, the Defendant stated that all he could remember talking about was "running from the cops." He did not remember Investigator Norris presenting him with the written statement. He acknowledged having signed some "papers" but stated that he was not sure what they were and that he did not read them. He testified that the officers told him "that if [he] signed the paper that they would make sure [he] got the lowest bond possible to get out." He stated that he had not been capable of reading during the interview because his eyes were still burning. He also stated that he did not remember his Miranda rights being read to him.

On cross-examination, the Defendant stated that he was twenty-eight years old and could read and write. When shown his statement, he acknowledged that the signature "look[ed] pretty close to" his own. He also averred that he had bad eyesight, including "astigmatisms."

The defense argued that the Defendant's statement was not voluntary. The trial court disagreed, ruling from the bench that "the proof is overwhelming in favor of [it] being a voluntary statement." Accordingly, the trial court denied the Defendant's motion to suppress. At the subsequent jury trial, held in March 2011, the following proof was adduced.

Valerie D., the victim's mother, testified that she had three children: an elder son, who was twelve years old at the time of trial; the victim, ten years old at the time of trial; and a daughter, seven years old at the time of trial. In 2009, she and the children lived in Cumberland County on Old Highway 70. She was using methamphetamine at the time, but she had been "clean" for a year and a half preceding the trial.

The victim's mother identified the Defendant and explained that she had met him in 2003 through Athena Donaldson, a mutual friend. She described the Defendant as having been "very good with children." Her sons were "very young at the time," and the Defendant "was very polite, very nice around them, and he would like to take them places." She and the Defendant both moved away, however, and she did not see him again until 2009, when he began staying with Donaldson.

After the Defendant learned of the victim's mother's whereabouts in 2009, he began visiting her again. She described him as her friend at the time and a friend of the children. She testified that she trusted him, adding,

> He was really good with kids, and I trusted him enough to send them away with him, because he had his own business, and he mowed lawns, and I thought it would . . . be a good thing for the boys to get out of the situation at home and go have like a little part-time job, something they could . . . grow on, and have a little bit of money, and, you know, learn the value of a dollar. And so they would go with [the Defendant] to go and mow lawns and other things.

The victim had turned nine years old in April of that year. The victim's mother testified that her two sons were with the Defendant most of the summer of 2009. However, toward the latter part of the summer, the Defendant began spending more time with the victim, leaving the elder son behind.

The victim's mother became concerned about the discrepancy in the time the Defendant was spending with her sons. She took the victim to a park on a day near the end of July to speak with him privately. Based on this conversation, during which the victim was "[s]cared" and "crying," she became very concerned. They went to the police station the next day. After this conversation, she decided not to allow the victim to be around the Defendant.

On cross-examination, the victim's mother acknowledged that she and the Defendant used methamphetamine together while the children were asleep. She stated that the Defendant took the victim without his brother "several times" during the summer of 2009. She denied having ever witnessed the Defendant touch the victim inappropriately.

Investigator Slayton testified at trial that he interviewed the Defendant on December 9, 2009. Investigator Chad Norris was also present. Investigator Slayton identified the Defendant's written waiver of his rights and his written statement, and both were introduced into evidence without objection. He stated that, prior to the Defendant's signing the waiver, he read the Defendant his <u>Miranda</u> rights. He even had the Defendant read out loud the waiver of those rights. He witnessed the Defendant then sign the Waiver of Rights. The Defendant then agreed to speak with Investigator Slayton.

Investigator Slayton testified that he then interviewed the Defendant about the instant charges. After the verbal interview, a written statement was prepared, which the Defendant then adopted and signed. Investigator Slayton read the written statement set forth above to the jury. Investigator Slayton testified that, at the time he gave his statement, the Defendant "was very coherent and very understanding of everything that was going on in the room at that time." According to Investigator Slayton, the Defendant "began to tear up" during his statement and "seemed very remorseful for what he was telling [him] had happened."

On cross-examination, Investigator Slayton acknowledged that the interview lasted an hour and forty-five minutes and began shortly after nine o'clock in the evening. He denied having pressured the Defendant "in any way." He also stated that there was no audio or video recording of the interview. He acknowledged that the written statement was in Investigator's Norris's handwriting.

The victim testified that he was currently ten years old. During the summer of 2009, when he was nine years old, he lived in a house on Old Highway 70 in Cumberland County with his mother and siblings. The Defendant, whom the victim identified in court, came by and visited, and he spent some time alone with the Defendant that summer.

The victim testified that, during the summer, he went with the Defendant to the state park in Crossville in the Defendant's car, a Firebird or a Thunderbird. The victim played at the park for a while and then went to use the bathroom. The Defendant followed him into the restroom. There was no one else present. The victim went into a stall, and the Defendant went into the stall with him. The victim found this "very odd" and, consequently, was "scared." The victim stated that the Defendant put the victim's penis in his mouth.

The victim next identified a photograph of a couch in the victim's house. On a day during the summer of 2009, he was on the couch with the Defendant. The victim was wearing pants. The Defendant put the victim's penis in his mouth.

The victim next identified a photograph of Oaklawn Cemetery that the victim stated was in Cumberland County. The cemetery was close to the victim's house. During the summer of 2009, the victim went there with the Defendant in the victim's mother's van.

They drove to a spot where the road was not visible and parked. The victim was in the front seat, but the Defendant told him to get in the back of the van. The victim did so and saw the Defendant put a condom on the Defendant's penis. The Defendant then pulled down the victim's pants and "tried to stick it up . . . [the victim's] butt." The victim testified that he was "scared." The episode lasted "a couple of minutes." The victim did not feel the Defendant's penis inside him, but he stated it was "close." The Defendant stopped, saying he thought he saw a light in a house nearby. They then left the cemetery.

Later, the victim told his brother what had happened. His brother told their mother, and the victim then talked to his mother about it at a park. They went to the police station, and he "told this lady what happened." The victim testified that the Defendant had told him not to tell anyone or they "would crash into a brick wall." They were in the Defendant's car when the Defendant said this to the victim.

Investigator Norris testified that he first learned about the allegations involving the victim in late July 2009. On that day, the victim's mother and the victim came in and made a report. A Department of Human Services worker was assigned and interviewed the victim at the House of Hope. Investigator Norris watched this interview on television while it was being conducted and recorded. There was also a forensic medical exam conducted of the victim, but the results were inconclusive.

After the victim was interviewed, Investigator Norris began looking for the Defendant. They spoke over the phone and scheduled an interview. On August 11, 2009, Investigator Norris, accompanied by Investigator John Haynes, met the Defendant at the Defendant's residence. They spoke outdoors. The Defendant was advised of his <u>Miranda</u> rights and agreed to speak with them. When they informed the Defendant that they were there because of the victim, the Defendant "became emotional" and "requested to stop talking." Investigator Norris told the Defendant, "we'll get back in touch," and the two officers left.

Investigator Norris testified that "two days or so after that," he attempted to contact the Defendant but was unsuccessful. Numerous subsequent attempts were also unsuccessful. In December, he learned that the Defendant was at the Justice Center. The Defendant's interview and statement ensued. Investigator Norris identified places on the written statement that contained corrections requested by the Defendant and bearing the Defendant's initials. Investigator Norris also signed the statement as a witness. The statement is dated December 9, 2009, at 10:45 p.m. Investigator Norris explained that the time indicated the end of the interview and statement. Investigator Norris confirmed that he had written out the statement. He also opined that the Defendant understood what was being recorded in the statement as Investigator Norris was composing it. The Defendant did not appear to be under the influence of any drugs or narcotics. The Defendant had told him, however, that he had

been "maced" earlier. Investigator Norris stated that he had been sprayed with mace and knew it to be "not pleasant at all." He added that, "by 30 minutes, the main effects were gone from it."

The Defendant testified at trial that he was currently twenty-nine years old. He worked as a landscaper. He had a prior conviction for driving on a revoked license. He described his relationship with the victim as "trying to be a friend of the family." He took the victim to mow yards, go fishing, play laser tag, and they went to "Chuckles." At the beginning of his friendship with the victim's mother, when he was living with Donaldson, the victim's mother would bring her children over "and drop them off for days at a time."

The Defendant acknowledged having signed the statement written by Investigator Norris. He testified that he "actually didn't know what [he] was signing, but [he] was told [he'd] be able to bond out and get out of there. [He] was under a lot of stress, and [he] had been roughed up and maced prior to coming in." About his initial August conversation with Investigators Norris and Hayes, he testified as follows:

> [W]e stood there and talked for quite some bit, and they just started getting into saying – talking about personal things, about, if I remembered how it was when I was nine years old when I woke up on my belly and had a hard-on. It was just questions like that, and I was starting to get upset about them. I didn't really feel comfortable with them talking to me about stuff like that. And then they brought up [the victim], and I told them that I had no knowledge of anything – any of the accusations made towards me. I then told them that I didn't want to speak with them anymore, that I'd like to get in touch with an attorney. And my niece come running out to me, and that's when I ended the whole conversation and walked away.

As to the interview at the Justice Center in December, the Defendant stated that he had been handcuffed and shackled. He stated that, initially, there were three other people in the room, but the female was asked to leave after he kept denying the accusations. About midway through the interview, Investigator Norris left, and Investigator Slayton "got a little bit more fierce." He stated that he did not remember signing the Waiver of Rights document.

The Defendant denied ever touching the victim inappropriately. He disagreed with the assertions in the written statement. He testified that the victim "asked [him] one time if he could call [him] dad and stuff, and it turned into kind of a father-son relationship after that."

On cross-examination, the Defendant stated that, before he was "maced" on December 9, 2009, he had been fleeing from the police "in fear for [his] life." He explained that the

victim's mother had told him that "something bad was going to happen to [him]," that her ex-boyfriend was friends with an officer, and that "he was going to make sure that [the Defendant] didn't make it to court." He stated that Investigators Norris and Slayton had lied and that the victim had lied. He averred that he signed the written statement because he "wanted a bond, [he] wanted to get out of jail." He testified that the investigators told him, "Once you sign this paper, you can go." He said that he was not fully aware of what was in the written statement. He explained that he had a lot of medical problems with his eyes, that he had been "maced," and that he was "on" Xanax and methamphetamine at the time. He did not remember telling the investigators that he had not used drugs for three months and that he had not been drinking alcohol.

Athena Donaldson testified that the Defendant was her "best friend." She had known him about ten and one-half years. She stated that he had a truthful reputation in the community and that the jury should believe his testimony. On cross-examination, Donaldson acknowledged that, at some points, her relationship with the Defendant had been romantic and that they had lived together.

Shannon Fields testified that she had known the victim's mother since they were eleven years old. She was also acquainted with the Defendant. He had a truthful reputation in the community, and the jury should believe his testimony.

Dr. Michael Ellis testified that he had known the Defendant since 1997 or 1998, when the Defendant's mother began working for him. The Defendant also did a lot of work for him, both at Dr. Ellis's office and at his farm over the course of about five years. Dr. Ellis described the Defendant as "a very good young man." He believed the Defendant to be truthful and thought the jury should believe his testimony. On cross-examination, Dr. Ellis stated that he did not know of the Defendant's illegal drug use. He also stated that he did not socialize with the Defendant and acknowledged that he did not know a lot about the Defendant's private life.

Eva Estelle Lewis, the Defendant's grandmother, testified. She testified that he was a truthful person and that his testimony should be believed.

After hearing this proof, the jury convicted the Defendant on all three counts as charged. The trial court subsequently sentenced the Defendant to twenty-five years on each of the two rape of a child convictions and to ten years on the attempted rape of a child conviction. The trial court ordered that the sentences run concurrently and be served in the Department of Correction.

ANALYSIS

In this appeal as of right, the Defendant raises three issues for our review: (1) whether the trial court erred in denying his motion to suppress; (2) whether the trial court erred in denying his motion for judgment of acquittal due to variances between the charges as described in the bill of particulars and the proof at trial; and (3) whether these errors, cumulatively, entitle him to a new trial. For the reasons articulated herein, we conclude that the Defendant has waived appellate review of all of the issues presented in his brief.

The judgments of conviction in this case were entered on June 27, 2011. The Defendant's motion for new trial was not filed until October 3, 2011. Nevertheless, the trial court conducted a hearing on the Defendant's motion for new trial on October 7, 2011, noting that "we're quite a few months later after sentencing for the Motion for New Trial, but we were getting a transcript and giving everyone an opportunity to review that and be prepared for that." The trial court continued: "So, [defense counsel], if you're ready, then we'll proceed with your motion." After the hearing, the trial court denied the Defendant's motion for new trial from the bench. The Defendant filed his notice of appeal on November 3, 2011.[3] The State asks that this appeal be dismissed because the Defendant failed to file a timely notice of appeal.

Our rules of criminal procedure provide that "[a] motion for a new trial shall be in writing or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). "[T]his thirty day period is jurisdictional and cannot be expanded." State v. Hatcher, 310 S.W.3d 788, 800 (Tenn. 2010). Thus, "[a] trial judge does not have jurisdiction to hear and determine the merits of a motion for a new trial which has not been timely filed." State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004). In this case, the motion for new trial was not filed until several months after the order of sentence was entered. Nevertheless, the trial court conducted a hearing on the merits of the motion. As a result of the untimely filed motion for new trial, the trial court was without jurisdiction to consider the motion. See State v. Dodson, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). Additionally, "[i]f a motion for new trial is not timely filed, all issues are deemed waived except for sufficiency of evidence and sentencing." Bough, 152 S.W.3d at 460.

Moreover, a notice of appeal must be filed "within 30 days after the date of entry of the judgment appealed from." Tenn. R. App. P. 4(a). An untimely motion for new trial will not toll this thirty-day period. See Tenn. R. App. P. 4(c); State v. Davis, 748 S.W.2d

_____

[3] The record also contains a written order denying the motion for new trial signed by the trial judge on November 30, 2011, and filed on December 2, 2011.

-10-

206, 207 (Tenn. Crim. App. 1987). Here, the notice of appeal was filed more than thirty days after judgment was entered. However, "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a).

Unlike other rules of procedure, Rule 33 does not contain a provision for untimely filed motions for new trial. See, e.g., Tenn. R. Crim. P. 32(f) (withdrawal of guilty plea allowed "for any fair and just reason" before sentence is imposed or "to correct manifest injustice" after judgment entered but before it becomes final); Tenn. R. App. P. 4(a) (in criminal cases, "notice of appeal" document is not jurisdictional and filing may be waived "in the interest of justice"). While this court may waive the untimely filing of the notice of appeal, we do not have the authority to waive the untimely filing of a motion for new trial. State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997); State v. Stephens, 264 S.W.3d 719, 728 (Tenn. Crim. App. 2007); see also Tenn. R. App. P. 4(a).

As previously noted, if a motion for new trial is not filed within the mandatory thirty-day period, all issues are deemed waived except for sufficiency of the evidence and sentencing. Bough, 152 S.W.3d at 460; Martin, 940 S.W.2d.at 569. None of the issues raised by the Defendant involve sufficiency of the evidence or sentencing. As such, for the purpose of our appellate review, all of the Defendant's issues are waived. See, e.g., Melissa L. Grayson, No. M2011-00648-CCA-R3-CD, 2012 WL 3611821, at *10-11 (Tenn. Crim. App. Aug. 20, 2012). Moreover, the Defendant makes no argument that this court should review these issues as plain error, and we see no reason to do so sua sponte. The Defendant has waived his issues by failing to raise them in a timely motion for new trial.

CONCLUSION

In sum, we conclude that the Defendant has waived his appellate issues by failing to preserve them in a timely-filed motion for new trial. Therefore, we affirm the judgments of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE

-11-