# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
January 9, 2013 Session

## STATE OF TENNESSEE v. MARTIN BOYCE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 09-05387      Carolyn Wade Blackett, Judge**

**No. W2012-00887-CCA-R3-CD  - Filed August 6, 2013**

Defendant, Martin Boyce, was indicted in a seven-count indictment alleging one count of second degree murder, two counts of attempted second degree murder; two counts of aggravated assault; one count of employing a firearm during the commission of a dangerous felony, and one count of possession of a handgun by a convicted felon.  Following a jury trial, Defendant was convicted of the lesser-included offenses of criminally negligent homicide and reckless endangerment in counts 1 and 2, attempted second degree murder in count 3, aggravated assault in count 5, employing a firearm during the commission of a dangerous felony in count 6, and possession of a handgun by a convicted felon in count 7. Defendant was acquitted of one count of aggravated assault in count 4.  Following a sentencing hearing, the trial court sentenced Defendant to serve four years for each conviction in counts 1 and 2, 17 years for his conviction in count 3, eight years for his conviction in count 5, and six  and four years respectively for his convictions in counts 6 and 7.  Defendant's sentences in counts 1, 2, 3, and 5 were ordered to run concurrently with each other and consecutively to his sentences in counts 6 and 7, which were ordered to run consecutively with each other and his other sentences, for a total effective sentence of 27 years.  On appeal, Defendant asserts that: 1) the evidence at trial was insufficient to support his conviction for attempted second degree murder; 2) the trial court erred by failing to sever count 7; 3) the trial court erred by not requiring the State to elect a dangerous felony underlying the offense in count 6 and by failing to instruct the jury as to the dangerous felony underlying the offense in count 6; 4) Defendant's dual convictions for employing a firearm during the commission of a dangerous felony and being a convicted felon in possession of a firearm violate double jeopardy, and 5) the trial court should not have ordered Defendant's sentence in count 7 to run consecutively to his other sentences.  The State asserts that Defendant has waived all issues except sufficiency of the evidence and consecutive sentencing because the motion for new trial was untimely filed.  We reject the State's argument concerning the timeliness of the motion for new trial.  The judgment of conviction was not stamp-filed by the clerk, and thus there is nothing in the record to show that the motion for new trial was filed late.  After reviewing the issues on the merits, we reverse

Defendant's conviction in count 6 and remand for a new trial. We also remand count 3 for entry of a corrected judgment which indicates the disposition of the charge as guilty by jury verdict. The remaining convictions and sentences are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the
Criminal Court Affirmed in Part, Reversed in Part, and Remanded**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JERRY L. SMITH, J., joined. D. KELLY THOMAS, JR., J., filed a separate opinion concurring in part and dissenting in part.

David A. Stowers, Bolivar, Tennessee, for the appellant, Martin Boyce.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Greg Gilbert, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

Patricia Merriweather, the mother of murder victim Carlos Bee, testified that on November 17, 2008, she went to the James Lounge with her son and daughter, Carlos Bee and Dominique Bee, her sisters, Serekia and Felicia Merriweather, her niece, Shundreka Chalmers, and Ms. Chalmers' boyfriend, Phon Hang. She testified that while they were there, another group of individuals "stood in the back of the club [and] watched [them] the whole time." Ms. Merriweather testified that "a heavy-set lady" with pink and gold hair "was constantly coming over to dance on Carlos and Christopher." The woman, named Rena Shell, pushed Ms. Chalmers into a speaker, and Patricia's sister Felicia Merriweather confronted her. Felicia and Rena Shell began fighting, and Ms. Shell said, "'You don't want none.'" Patricia Merriweather testified that she saw Defendant whisper into Ms. Shell's ear. Patricia and her family decided to leave the club. She testified that Defendant punched her in the face while they were leaving and she fell to the floor. Carlos ran over to check on her, and she told him that no one had hit her because she did not want Carlos to get into a fight with anyone.

Patricia Merriweather testified that after they exited the club, she walked past Defendant and saw that he had his hands in his pockets and a gun handle was sticking out of both pockets. She testified that she went to her truck, but she could not leave the parking lot because the truck was blocked by another car. She was trying to gather her family members to leave, but there were people keeping them from getting into their cars. She then heard gunshots and saw people running to their cars. She thought someone was firing a gun

-2-

into the air. She testified that she saw Defendant walking past her "a minute before all the shots rang out," and she testified Defendant "turned around and looked [her] in [her] face and smiled." Someone in the parking lot said that Carlos had been shot. Patricia Merriweather found her son lying on the ground between two cars. He had been shot in his head.

Ms. Merriweather told investigators that Defendant was wearing a white jogging suit. She testified that she did not recognize Defendant in a photo lineup at first because he was wearing a hat at the James Club, and she did not realize that he had a receding hairline.

Dr. Marco Ross testified that he performed an autopsy on Carlos Bee. Dr. Ross testified that Mr. Bee died from a gunshot wound to the head. The bullet entered the front left side of the victim's head, fractured his skull, passed through his brain, and exited the back right side of his head. The victim also had abrasions and lacerations on his head and abrasions on his shoulder and elbow that, Dr. Ross testified, could have been caused by his falling on the pavement or being hit by an object. A toxicology report indicated that the victim had a blood alcohol level of .07 and the victim had THC in his system.

Derrick Harris went to the James Lounge on the night of the shooting. Mr. Harris was there with his friend Terrill "Kool-Aid" Hooks. He testified that he did not stay long because "a fight broke out" between some women. He testified that the club owner told the women to leave. Mr. Harris also left, and he saw the women fighting again in the parking lot. As he was leaving, he saw a man with a handgun swing at another man. Mr. Harris testified that the gunman was African-American, approximately six feet tall, and was wearing a hooded sweatshirt. The man then looked as though he was going to swing at Mr. Harris, and Mr. Harris "rushed him, and [they] got to tussling, and he dropped the gun." Mr. Harris picked up the gun and fired it. Mr. Harris heard "multiple" other gunshots. He testified that he saw three other people with guns. He ran away from the scene, and "Kool-Aid" got the car they were driving. They then drove to the hospital. Mr. Harris was shot in both of his feet, and he sustained a broken bone in each foot.

Mr. Harris denied that he circled Defendant's photo in a photographic lineup and wrote, "This is the guy that shot me in my foot and he was walking around in [a] rage hitting people in the face with the gun." Mr. Harris recognized his signature on a statement he gave to the police. In the statement, Mr. Harris told police that he saw two people with guns.

Terrill Hooks testified that he went to the James Lounge with Mr. Harris on the night of the incident. They arrived shortly before 12:00 a.m. Mr. Hooks testified that they stayed at the James Lounge for approximately 45 minutes. He saw a fight break out between several women, and security personnel then told everyone to leave the club. Mr. Hooks testified that the fight between the women continued in the parking lot. He heard someone say, "'Go get

the guns.'" When he heard that, he told Mr. Harris it was time to go. They began walking toward the TitleMax parking lot where they had parked their vehicle. He saw a man, whom he identified at trial as Defendant, hit another man in the face with a handgun. Defendant then came toward Mr. Hooks and Mr. Harris. Mr. Hooks testified that Defendant "swung [the] gun in [his] face." Mr. Harris knocked the gun out of Defendant's hand, Defendant dropped the gun, and Mr. Harris recovered it. Mr. Hooks heard eight or nine gunshots. Mr. Hooks ran away from the scene. He returned after he heard police and ambulance sirens. He saw Mr. Harris limping. Mr. Harris threw the gun into some bushes, and they got in their car and left the scene. Mr. Hooks took Mr. Harris home to change clothes and then drove him to the hospital. Mr. Hooks testified that he did not see the person or people firing shots. He testified that they lied to the police because they "didn't want to be involved in what was going to happen." Mr. Hooks testified that he did not know at that time that someone had been killed in the gunfire. Mr. Hooks subsequently gave a statement to the police and identified Defendant as the man with "a gun and shooting." On cross-examination, Mr. Hooks testified that he did not see anyone shoot a gun because he ran after he saw Mr. Harris take the gun from Defendant. He heard gunfire as he was running away. He saw three people holding guns in the parking lot. He did not see Mr. Harris or anyone else get shot.

Shundreka Chalmers, Felicia Merriweather's daughter and Patricia Merriweather's niece, went to the James Lounge with a group of family and friends. She testified that while they were at the club, she was dancing by herself and she "felt a push" from behind. She continued dancing and then "felt a hard push." The push caused her to fall into the speakers. She turned around to see who had pushed her, and a woman named Rena Shell had pushed her and was "hollering" at her. Felicia Merriweather confronted the woman, and they "had a few words." Then Ms. Chalmers and her mother and aunt decided to leave the club. The music stopped and security personnel asked patrons to leave. Ms. Chalmers testified that there was "a lot of chaos going on" in the parking lot. Ms. Chalmers testified that she was uncomfortable. She was looking for everyone in her party so they could get in their cars and leave. She testified that she saw her mother, Felicia, and Ms. Shell shouting at each other. Ms. Chalmers testified that both women appeared intoxicated and were falling over each other. As she was walking toward the TitleMax parking lot, she saw three men carrying guns and walking towards the club parking lot. She saw one of the gunmen, whom she identified as Defendant, hit Carlos Bee in the head with a gun. She then saw Defendant "tussling with another young man" in front of the dumpsters. She testified that Defendant had two guns, and he dropped one. She testified that Defendant then "started shooting." She ran around the building and waited until she did not hear any more gunfire. When she walked back to where the shooting occurred, she saw her aunt Serekia Merriweather holding Carlos on her lap. Carlos had been shot in the head. Ms. Chalmers testified on cross-examination that she did not see the person who shot Carlos Bee.

-4-

Serekia Merriweather testified that while she was inside the club, she saw someone named Rena Shell dancing in front of the mirror. She testified that Rena Shell had pink hair and she was dancing "really sexy" in front of the men at Ms. Merriweather's table. She also saw the altercation between the women inside the club and outside in the parking lot. She testified that she thought it was just "two drunk women out here tussling" and that the altercation would end and they would leave. She was standing beside her niece Shundreka Chalmers when she saw Carlos fall. She thought he had tripped, but she "found out later he had been hit in the head." She saw Defendant standing near Carlos when Carlos fell. She saw that Defendant had two guns, and she grabbed Defendant's arm. She testified that she asked Defendant, "'Why do you have two guns? – it's two drunk whores fighting." Defendant said, "'Let me go, bitch, before I shoot you." She then saw Defendant point his gun in a man's face. She saw Defendant "tussling" with another man and then she saw Defendant shoot one of the men in his feet. She then saw Defendant "shooting back into th[is] area" where she had been standing, and she laid on the ground between two cars. She testified that she heard "over ten [gun]shots," and then she heard someone scream that Carlos had been shot. She ran around the car and found Carlos lying on the ground "bleeding out of his face." She testified that he was not responsive. Ms. Merriweather testified that Defendant was the only person she saw with a gun. She testified that Defendant was wearing a white jacket with "Coogi" written on the back.

Dominique Bee, Carlos Bee's sister, testified that the night of the shooting was the first time she had been to the James Lounge. She testified that she saw Defendant standing near the restrooms before the incident between Rena Shell and Shundreka. When the incident between the two women happened, Defendant was standing beside Rena Shell. Ms. Bee testified that Defendant "was really quiet." She saw Defendant leave the club. When she and her friends exited the club, Defendant was in the parking lot asking "who messed with [Rena Shell?]" She testified that Defendant had two handguns "in his pocket." She saw two other men with guns. Ms. Bee walked towards the TitleMax parking lot where her car was parked. When she got to her car, she "snatched [her] brother [Carlos] to tell him to get in the car with [her] because there was a lot of commotion going on." Carlos "snatched away and said he had to go find his friend." She testified that she heard gunfire and she got inside her car and hid in the floorboard. She testified that she looked over the seat and saw Carlos behind her car. Defendant was standing in front of Carlos, and Ms. Bee heard Carlos say, "'Please stop. We didn't come to do that. We just came here to have a good time.'" Then Defendant chased Carlos around the car. Ms. Bee saw Defendant point his gun at Carlos and shoot Carlos in the head. Ms. Bee identified Defendant in a photo lineup as the person who shot her brother.

Renardo Wilson testified that he went with Defendant to the James Lounge on the night of the incident. They rode together in Erica Teal's white Lexus. They arrived at the

-5-

James Lounge at approximately 12:00 a.m. He testified that he saw the altercation inside the club and that Defendant "broke it up" and told Rena Shell "to leave it alone." The fighting continued outside the club, and Mr. Wilson testified that he and Defendant got in the car and left. Defendant was wearing only one shoe. Mr. Wilson did not see anyone get shot. He testified that Defendant drove. Mr. Wilson did not remember whether Defendant was armed with a gun. Mr. Wilson denied the accuracy of the statement he gave to the police after the incident. Specifically, Mr. Wilson denied that he told police that he saw Defendant carrying a gun "'when he came to the car after the shots were fired.'" Wilson testified that when Defendant got inside the car, "shots w[ere] still firing." Wilson testified that "it's possible" that he described the gun Defendant was carrying as "'an all black automatic[,]'" but he did not remember. He testified that he had been drinking when he gave the statement. When the left the club, they drove to Defendant's sister Shaneka's house. Mr. Wilson testified that he identified Defendant in a photo lineup as someone he knew "from the neighborhood." He testified that police showed him the lineup and asked if he knew anyone, but they did not ask him to identify the shooter.

Phon Hang testified that Shundreka Chalmers was his girlfriend at the time of the incident. He testified that after he exited the club, he saw Defendant "walking up with guns." He testified that Defendant had two guns and was holding one in each hand. Defendant was waving the guns and pointing them at people. Mr. Hang testified that he saw Defendant hit Carlos Bee in the mouth with his gun. He testified that Defendant "was the only person with a gun." He saw Defendant swing his gun at another man and the gun "flew out of his hand." The other man reached for the gun, and Mr. Hang heard gunfire. He testified that he ducked down and turned his back. When the gunfire stopped, he turned around and saw Carlos lying on the ground. Mr. Hang did not see who fired the shots. After the incident, he took Ms. Chalmers to the hospital because she had been grazed by a bullet. Mr. Hang gave a statement to police and identified Defendant in a photo lineup as the person he had seen holding two guns.

Memphis police officer Keith Phillips responded to a call of shots being fired at the James Lounge. When he arrived, he found Carlos Bee lying in the parking lot. Mr. Bee had suffered a gunshot wound to the head. Officer Phillips took statements from witnesses and secured the crime scene. He observed shell casings in the parking lot and a shoe. Officer Antoine Smith also responded to the scene of the shooting. Officer Smith recovered a magazine to an automatic handgun. Officer Smith left the crime scene and went to another location to search for a suspect. When he arrived, he saw the suspect vehicle, a white Lexus. He noticed a white jacket with blood on it inside the car. He went inside the house and found one white shoe with red shoestrings that matched the shoe found at the crime scene. Officer Charles Cathey testified that there was a red dot that appeared to be blood on the shoe.

-6-

Sergeant Alpha Hinds investigated the case and collected evidence at the crime scene. Sergeant hinds found spent bullets, shell casings from a .40 caliber Smith and Wesson and shell casings from a .45 automatic, a baseball cap, a magazine clip and live rounds of ammunition for a .40 caliber Smith and Wesson, and a Nike shoe with red shoelaces. Sergeant Hinds also observed a bullet hole in the windshield of a car and bullet marks and blood on the wall of the TitleMax building.

Lieutenant Bart Ragland testified that the victim was pronounced dead at the scene. He testified that the blood found on the jacket and shoe was Defendant's blood. Lieutenant Ragland also testified that Renardo Wilson was not a cooperating witness and that Mr. Wilson gave different versions of the events that occurred. Lieutenant Ragland testified that an arrest warrant was issued for Defendant, and Defendant was arrested on March 18, 2009. Defendant was advised of his rights, and he signed a waiver of his rights, but Defendant did not give a written statement.

Testimony was also presented that Defendant had prior convictions for attempted aggravated burglary and felony theft over $1,000.00.

Sylvia Gaither, Defendant's sister, testified for Defendant. Ms. Gaither testified that she had never known Defendant to own any guns and that she had never seen Defendant's hair in braids or known Defendant to wear a wig.

*Sentencing Hearing*

At the sentencing hearing, the presentence report was admitted into evidence. Patricia Merriweather then gave a victim impact statement. Ms. Merriweather testified that she was present the night her son was killed. She testified that she saw Defendant, that Defendant was carrying two guns, and that her Carlos Bee was unarmed. Ms. Merriweather read aloud from her written statement, which stated in part:

> First of all, I want to tell you that it's no way possible that my daughter [Dominique Bee] would have identified you as shooting her brother if she didn't see you do it herself. We don't want you to go to jail if you didn't do anything.
>
> You hurt our family so much that night. You don't even understand the hardship you put our family through. You can't begin to understand unless you lost somebody yourself.

I've never been out with my children before. I went out that night with them and my family to have a nice time, and you turned that night into a night of terror for all of us.

. . . .

I think that you should receive the maximum sentence for the crimes that you committed that night; and I know, by the acts that you committed that night that you did this before, and you will hurt somebody else's family member or hurt somebody else if you are not punished for the things you did.

At the conclusion of the sentencing hearing, the trial court classified Defendant as a Range II multiple offender. The court imposed the following sentences: four years in count 1, four years in count 2, 17 years in count 3, eight years in count 5, six years in count 6, and four years in count 7. The court ordered Defendant's sentences in counts 1, 2, 3, and 5 to be served concurrent with each other and consecutive to his sentences in counts 6 and 7, which were ordered to be served consecutive to each other, for a total effective sentence of 27 years.

*Analysis*

**Timeliness of Defendant's Motion for New Trial**

We first address the State's contention that Defendant's motion for new trial was not timely filed. The jury returned its verdict on October 7, 2011. A sentencing hearing was held on November 30, 2011. A uniform judgment form was completed pursuant to Rule of the Tennessee Supreme Court 17. One of the blank spaces on the uniform judgment document is located to the right of the space designated for the trial judge's signature and is labeled "Date of Entry of Judgment." On the judgments in each of Defendant's six convictions, the date "11-30-11" is handwritten in that space. Immediately above that date, on each of the judgment forms, there is also a handwritten notation, "Judg Exec," which may be an abbreviation for "judgment executed," and the date "1-18-12" appears beside the notation. January 18, 2012 is the date on which the trial court heard arguments on Defendant's motion for new trial and denied the motion. The trial court clerk's signature appears nowhere on the face of the judgment, and there is no clerk's file stamp on any of the judgments.

We also note that on the judgment form in count 3, attempted second degree murder, there is no indication that Defendant was found guilty by a jury verdict. The boxes indicating the disposition of the charged offense were left unchecked.

Defendant filed a motion for new trial on January 10, 2012. The State asserts in its brief that the motion for new trial was untimely because it was not filed within 30 days of November 30, 2011. Defendant did not file a reply brief in response to the State's argument that Defendant's motion for new trial is untimely.

In *State v. Stephens*, 264 S.W.3d 719 (Tenn. Crim. App. 2007), this court addressed a similar issue. In that case, the State argued that the defendant waived all issues other than the sufficiency of the evidence because the defendant did not timely file his motion for new trial. *Id*. at 727. The defendant in *Stephens* was appealing his conviction of first degree murder. He raised three issues wherein the remedy would be a new trial, in addition to challenging the sufficiency of the evidence. *Id*. at 722. In *Stephens*, the jury returned its verdict of guilty on September 3, 2004, and immediately following the verdict, the trial court imposed a sentence of life imprisonment, the only possible sentence in the defendant's case. *Id*. at 727. As this court noted, "Presumably sometime thereafter, the district attorney prepared a uniform judgment document as required by Tennessee Code Annotated section 40-35-209(e)(1)." *Id*. Tennessee Code Annotated section 40-35-209(e)(1) provides as follows:

> (e)(1) After the defendant is sentenced, the district attorney general **shall complete and file** within thirty (30) days the uniform judgment document for the conviction that is signed by all parties; but if not signed by the parties, the clerk shall make a copy of the document available to the parties before entry by the court, . . . .

(Emphasis added).

In *Stephens*, like in the case *sub judice*, the uniform judgment document had a date filled in on the blank space designated for "Date of Entry of Judgment." The date designated in *Stephens* was September 3, 2004, the same date of the jury verdict and the trial court's pronouncement of the sentence in open court. *Id*. However, unlike the case *sub judice*, the judgment form in *Stephens* had two stamps on it. There was the "file-stamp" showing the judgment was filed with the circuit court clerk on September **10**, 2004, and also a minute-entry stamp reflecting date of minute-entry of the judgment on September 10, 2004. *Id*.

The motion for new trial in *Stephens* was filed on October 7, 2004, more than 30 days after September 3, 2004, the date the State asserted was the date of entry of the judgment. *Id*. The State argued that pursuant to Rules of Criminal Procedure 33(b) and 45(b)(3), that certain issues were waived because the motion was filed more than 30 days after entry of the judgment and the time period could not be extended. *Stephens*, 264 S.W.3d at 727. The defendant in *Stephens* argued that the uniform judgment was entered on September 10, 2004

(one week *after* the sentence was pronounced in open court and one week after the date filled in on the blank space designated "Date of Entry of Judgment") the date clearly indicated as the date the judgment was filed with the trial court clerk.

This court agreed with the defendant and held,

> In order to promote fairness, consistency, and uniformity, we agree with the rationale of the courts in [*State v. Willie*] *Norman*[,] [No. W2003-02067-CCA-R3-CD, 2004 WL 2255253 (Tenn. Crim. App., Oct. 7, 2004)] and *Graham* [*v. State*, 90 S.W.3d 687 (Tenn. 2002)] and conclude that the order of sentence was entered on the date the uniform judgment document was filed with the court clerk - September 10, 2004.

*Id*. at 730.

In *State v. Willie Norman*, the judgment was signed by the trial judge on July 15, 2003, the same date that the defendant entered his guilty plea. The judgment was not filed with the trial court clerk until two weeks later, on July 29, 2003. *Willie Norman*, 2004 WL 2255253 at *5. The notice of appeal (the defendant had reserved a certified question of law for appeal) was filed on August 23, 2003. The court in *Willie Norman* concluded that the judgment was entered on the date it was filed with the trial court clerk. In *Graham*, our supreme court addressed the timeliness of an application to appeal the denial of a motion to reopen a post-conviction petition. *Graham v. State*. 90 S.W.3d at 689. The order of the trial court denying the motion was signed by the trial judge on December 6, 2000, but it was not filed in the trial court clerk's office until December 13, 2000. In determining which date was the date of "entry" of the order, our supreme court held that the day the judgment was *filed* by the clerk, and *not* the day the judgment was signed by the trial judge, was the day the judgment was entered and thus when the time commenced to run for filing an application to appeal.

Particularly pertinent to the issue in the case *sub judice*, this court in *Stephens* stated,

> It is our view that the "file-stamp" date provides evidence of when the order of sentence was entered by the clerk. Thus, the effective date for entry of a judgment or order of sentence is the date of its filing with the court clerk after being signed by the judge.

*Stephens*, 264 S.W.3d at 729.

In Defendant's case, two handwritten dates appear on the judgment form; however, there is nothing in the record to conclusively state what day the judgment was filed with the trial court clerk. Based upon the authorities cited above, only a "file-stamp" or other similarly designated marking by the trial court clerk can suffice to show what date the judgment was filed. A handwritten notation on the judgment form above the pre-printed "Date of Entry of Judgment" without being signed by the trial court clerk is not an indication of when the judgment was filed.

Our General Assembly assigned the responsibility to complete *and file* the judgment document to the district attorney general. Tenn. Code Ann. § 50-35-209(e)(1). Implicitly, this includes the responsibility to ensure that the document is "stamp-filed" by the trial court clerk in compliance with rules and case law. Absent a "stamp-filed" judgment, we are unable to conclude that Defendant's motion for new trial was not timely filed. Accordingly, we will address Defendant's issues on the merits.

**Sufficiency of the Evidence**

Defendant asserts that there was insufficient evidence to sustain his convictions. Defendant argues that the evidence to support his conviction for attempted second degree murder is "particularly lacking" because the victim was shot in his feet. Defendant offers no argument, however, in support of his blanket statement, "[the] remaining convictions are not supported by the evidence." Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Therefore, we will address only the issue of the sufficiency of the evidence as it relates to Defendant's attempted second degree murder conviction.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." *Id.*; *State v. Tuggle*, 639 S.W.2d 913,

914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." *State v. Pendergrass*, 13 S.W.3d 389, 392–93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Id*. (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." *State v. Sisk*, 343 S.W.3d 60, 67 (Tenn. 2011).

Second degree murder is defined as the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). Criminal attempt requires, as relevant here, proof that a person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense . . . and the conduct constitutes a substantial step toward the commission of the offense." *Id*. § 39–12–101(a)(3). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]" *Id*.

The Tennessee Supreme Court has explained that circumstantial evidence is often the only means of proving mental state: "[W]hile a defendant's mental state is rarely subject to proof by direct evidence, it is within the authority of the jury to infer the defendant's intent, and, therefore, whether the defendant acted 'knowingly,' from surrounding facts and circumstances." *Brown*, 311 S.W.3d at 432 (citations and quotations omitted).

Defendant argues that the evidence is insufficient to support his conviction for attempted second degree murder because Derrick Harris was shot in his feet. Defendant asserts that Defendant's "actions would amount to aggravated assault at best." We disagree. The evidence, as viewed in a light most favorable to the State, shows that Defendant fired multiple shots at an unarmed Harris at close range with an automatic handgun. That the bullets struck Harris in the feet does not absolve Defendant of guilt. From the evidence, a jury could have inferred that Defendant acted with the intent to commit the knowing killing of Harris. The jury also could have found that Defendant's conduct, shooting at Harris, constituted a substantial step toward that end. The evidence, therefore, was sufficient to support the conviction for attempted second degree murder. Defendant is not entitled to relief on this issue.

**Motion to Sever**

Defendant asserts that the trial court erred by denying his motion to sever count 7, possession of a handgun by a convicted felon, from the remaining six counts of the indictment. Defendant argues that "the jury was tainted beyond repair" by having heard evidence of his prior convictions, and he was therefore denied a fair trial because evidence of his prior felony convictions would have been otherwise inadmissible under the Tennessee Rules of Evidence in a trial of the other offenses. The State contends that the trial court did not err in denying Defendant's request to sever and that the court's instructions to the jury cured any error.

Decisions to consolidate or sever offenses are reviewed on appeal for an abuse of discretion. *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). As such, a trial court's decision to consolidate or to sever offenses will not be reversed unless the "court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *Id*. (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn.1997)).

A joinder of multiple offenses may be either mandatory or permissive. *See* Tenn. R. Crim. P. 8(a)(1), 8(b)(2). "Two or more offenses must be joined or consolidated if (1) the offenses arise from the same conduct or criminal episode; (2) the conduct is known to the appropriate prosecuting official at the time of the return of the indictment; and (3) the offenses fall within the jurisdiction of a single court." *State v. Baird*, 88 S.W.3d 617, 620 (Tenn. 2001) (citing Tenn. R. Crim. P. 8(a)); *see also State v. Goodwin*, 143 S.w.3d 771, 780 (Tenn. 2004). A severance of mandatorily joined offenses shall be granted (1) before trial if it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence or (2) during trial if it is deemed necessary to achieve such a fair determination of the defendant's guilt or innocence. Tenn. R. Crim. P. 14(b)(2)(A), (B).

The Advisory Commission Comments to Rule 8 provide, in pertinent part:

> This rule is designed to encourage the disposition in a single trial of multiple offenses arising from the same conduct and from the same criminal episode, and should therefore promote efficiency and economy. Where such joinder of offenses might give rise to an injustice, Rule 14(b)(2) allows the trial court to relax the rule.

Prior to trial, Defendant filed a motion to sever count 7 from the remaining counts in the indictment. At a hearing on Defendant's motion, defense counsel suggested that the trial court hold a bifurcated hearing in which the jury would consider proof of Defendant's prior convictions after finding that Defendant was in possession of a handgun. The trial court declined, stating:

-13-

But I guess where I differ is that I – you know, when I instruct the jury, that it is merely – the indictment is merely an allegation of a charge against the defendant, then they have to find whether or not he is guilty of criminal-attempt murder first degree. They have to find all these things. Okay. As it stands, I make it very specific during the jury instructions as he sits there right now, there's a presumption of innocence there, which means that all the charges that have been or will be read by the state, he's innocent. Okay. So, that's a finding that they have to make. They can find that based on – I don't know – whatever kind of evidence that you have – that he's not a convicted felon. I mean, they could hear the clerk and still decide that – that he's not. I mean, I'm just saying that I think it would be very difficult to bifurcate. If he's been charged with that, he's been charged with it. Okay. And it's really up to the jury because they could find – they could do a complete acquittal of everything.

In its ruling the trial court did not make any findings regarding whether the joinder of the offenses in this case was permissive or mandatory, or whether severance was appropriate. Defendant framed the issue, at trial and on appeal, as one of bifurcation, rather than severance, and the trial court's ruling failed to address the issue. Nevertheless we will address the severance issue in this appeal.

In this case, all of the offenses were charged in the same indictment, and we conclude that joinder of the possession of a handgun offense with the other offenses was mandatory. "A 'criminal episode relates to several distinct offenses which arise out of separate actions or conduct but which occur in a closely connected series of events in place and time.'" *Baird*, 88 S.W.3d at 620 (quoting D. Raybin, Tennessee Criminal Practice and Procedure § 17.23, p. 490 (1984)). Defendant does not contest that the offense in count 7 arose from the same criminal episode as the remaining counts. In order to establish that the trial court abused its discretion by denying severance of the offense, therefore, Defendant must show that severance was "necessary to achieve a fair determination of [his] guilt or innocence of each offense." Tenn. R. Crim. P. 14(b)(ii).

Defendant contends that he was prejudiced by the joinder of offenses because the jury was allowed to hear testimony concerning his prior convictions which would have been inadmissible pursuant to the Tennessee Rules of Evidence. Rule 404(b) of the Tennessee Rules of Evidence excludes evidence of "other crimes, wrongs, or acts" committed by the defendant when offered only to show the defendant's propensity to commit the crime charged. Generally, evidence that a defendant has committed a prior crime is inadmissible because the evidence lacks relevance and "invites the finder of fact to infer guilt from propensity." *State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993)). We

acknowledge that evidence of Defendant's status as a convicted felon would normally not be admissible in a separate trial for the other offenses for which he was charged. However, Defendant's argument is misplaced because it is based on a permissive joinder analysis, and we have concluded that the joinder of the offenses in this case was mandatory. Therefore, the relevant inquiry is whether severance of the possession of a handgun by a convicted felon charge was necessary "to promote a fair determination of [Defendant's] guilt or innocence of each offense," and we conclude it was not.

The record shows that the trial court instructed the jury as to the elements of the offense of convicted felon in possession of a handgun, and the trial court further instructed the jury not to consider evidence of Defendant's prior convictions as evidence of his guilt on the other charges:

> If you find from the proof that the Defendant has been convicted of another crime or crimes than that for which he is presently on trial, you may not consider such evidence as proof of his disposition to commit the crime for which he is on trial.

The jury is presumed to follow the instructions of the court. *See State v. Banks*, 271 S.W.3d 90, 134 (Tenn. 2008) (citations omitted). Furthermore, if the trial court erred in denying severance of the offenses, we conclude that it was harmless error. The eyewitness evidence at trial was strong. Several witnesses testified that they saw Defendant in the immediate area of the shooting, at the time of the shooting, armed with two handguns. One witness, Dominique Bee, testified that she saw Defendant shoot Carlos Bee. *See Spicer v. State*, 12 S.W.3d 438, 447-48 (Tenn. 2000) (quoting *Delk v. State*, 590 S.W.2d 435, 442 (Tenn. 1979) (observing that "[i]n most severance cases, 'the line between harmless and prejudicial error is in direct proportion to the degree . . . by which proof exceeds the standard required to convict. . . .'")). Defendant is not entitled to relief on this issue.

**Election of "Dangerous Felony" Offense**

Defendant asserts that the trial court erred by not requiring the State to elect the dangerous felony underlying Defendant's conviction for employing a firearm during the attempt to commit a dangerous felony and by failing to instruct the jury accordingly. We note that Defendant did not raise this issue in his motion for new trial; however, the State concedes that it was plain error for the trial court not to require the prosecution to elect a dangerous felony and not to properly instruct the jury regarding the charge. Defendant and the State both assert that the proper remedy is to reverse Defendant's conviction for this charge and remand for a new trial. We agree.

-15-

"It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011). Moreover, the trial court must provide the jury with proper instructions as to the law governing the issues raised and the evidence introduced even without request. *Id*.

It is an offense to employ a firearm during the commission or attempt to commit a dangerous felony. Tenn. Code Ann. § 39-17-1324(b)(2). The dangerous felonies which may serve as a predicate for the firearms offense are statutorily enumerated. Tenn. Code Ann. § 39–17–1324(i)(1). They include attempted second degree murder. *Id*. § 39–17–1324(i)(1)(B). Defendant was charged in the indictment with two counts of attempted second degree murder. The indictment does not state which dangerous felony upon which the State relied. *See State v. Larry Jereller Alston, et al.*, No. E2012-00431-CCA-R3-CD, 2013 WL 2382589 (Tenn. Crim. App., May 30, 2013), *reh'g granted* (Tenn. Crim. App., June 25, 2013) (conviction was reversed where more than one offense alleged in the indictment could have served as the predicate dangerous felony). Defendant was convicted as charged of one count of attempted second degree murder and was convicted of the lesser included offense of reckless endangerment in the other count. Therefore, the only dangerous felony for which Defendant was convicted upon which his employment of a firearm charge could be based is the conviction for the attempted second degree murder of the victim Derrick Harris. However, the trial court did not instruct the jury on which dangerous felony the offense was predicated; nor do the jury instructions include a statutory definition of "dangerous felony." Defendant and the State agree that it is unclear from the record whether the jury relied upon the attempted second degree murder conviction or another impermissible felony.

In *State v. Michael L. Powell and Randall S. Horne*, No. E2011-00155-CCA-R3-CD, 2012 WL 1655279, at *14 (Tenn. Crim. App., May 10, 2012), a panel of this court held that it was plain error for the trial court not to instruct the jury as to which dangerous felony the defendant's charge was based. Also in *State v. Trutonio Yancey and Bernard McThune*, No. W2011-01543-CCA-R3-CD, 2012 WL 4057369, at *9 (Tenn. Crim. App. Sept. 17, 2012), a panel of this court held that the trial court committed plain error by not requiring the State to elect the dangerous felony underlying the offense of employing a firearm and by failing to properly instruct the jury regarding the dangerous felony. In both cases, the remedy for such an error was to reverse the firearm conviction and remand for a new trial on that offense. The same is true in this case. Therefore, the conviction for employing a firearm during the attempt to commit a dangerous felony is reversed and that count is remanded for a new trial.

-16-

**Double Jeopardy**

Defendant asserts that his constitutional right against double jeopardy was violated when he was convicted of both employing a firearm during the commission of a dangerous felony and being a convicted felon in possession of a handgun.

The double jeopardy clauses of the United States and Tennessee Constitutions protect an accused from (1) a second prosecution following an acquittal; (2) a second prosecution following conviction; and (3) multiple punishments for the same offense. *See State v. Watkins*, 362 S.W.3d 530 (Tenn. 2012). The present case involves the third category. When a defendant complains that multiple offenses under different statutes punish the same offense, then a court must employ the *Blockburger* analysis, as adopted by our supreme court in *Watkins*. *Id*. at 556 (adopting the standard announced in *Blockburger v. U.S.*, 284 U.S. 299, 304 (1932)).

Pursuant to the *Blockburger* test, the threshold inquiry is whether the defendant's convictions arose from the same act or transgression. *Watkins*, 362 S.W.3d at 545. If the convictions do not arise from the same act or transgression, the state and federal prohibitions against double jeopardy are not implicated, and the inquiry ends. *Id*. If, however, the convictions arose from the same act or transgression, the court must then determine whether the legislature intended to allow the offenses to be punished separately. *Id*. at 556. When the legislature has not clearly expressed its intent either to prevent or to preclude the dual convictions, the court must examine the statutes to determine whether the crimes constitute the same offense. *Id*. at 557. "The court makes this determination by examining statutory elements of the offenses in the abstract, rather than the particular facts of the case." *State v. Cross*, 362 S.W.2d 512, 519 (Tenn. 2012). "[I]f each offense includes an element that the other does not, the statutes do not define the 'same offense' for double jeopardy purposes," and courts "will presume that the Legislature intended to permit multiple punishments." *Watkins*, 362 S.W.3d at 557.

Pursuant to *Watkins*, we have examined the charging instrument and the relevant statutes, and we have considered whether the charges arise from a single act or transgression. *See Watkins*, 362 S.W.3d at 545. The record shows that the crimes occurred on the same night, in the same location, within a short time span. The two offenses at issue, employing a firearm during the commission of a dangerous felony and possession of a handgun by a convicted felon, clearly arose from the same conduct, Defendant's possession and use of a handgun on the night of the incident. Therefore, Defendant's double jeopardy claim survives our threshold inquiry.

Tennessee Code Annotated section 39–17–1324(b)(1) provides that it is "an offense to employ a firearm during the . . . [c]ommission of a dangerous felony[.]" The statute defines dangerous felony and enumerates specific felonies. The dangerous felony relied upon must not contain employment of a firearm as an essential element. *Id*. § 39-17-1324(i)(1), (c). Tennessee Code Annotated section 39-17-1307(c)(1) provides that "[a] person commits an offense who possesses a handgun and has been convicted of a felony." Defendant contends that both offenses require proof that the defendant was in possession or employed a firearm or handgun and that the defendant had a prior felony conviction. The State asserts, however, that a conviction for employing a firearm during the commission or attempt to commit a dangerous felony does not require proof of a prior conviction. We agree with the State's assertion. Proof of a "prior qualifying conviction" for the offense of employing a firearm is not an element of the offense. Rather, the statute provides that a jury's determination of a prior qualifying conviction is for purposes of sentencing. Tenn. Code Ann. § 39-17-1324(f), g(2), h(2). Employing a firearm during the commission of a dangerous felony is a Class C felony. Tenn. Code Ann. § 39-17-1324(h)(1), (h)(2). If the defendant has no prior felony convictions, the offense is punishable by a mandatory minimum six-year sentence; however, if the defendant has a prior felony conviction, the sentence is a mandatory minimum ten-year sentence. *Id*. Subsection (f) of the statute requires that a jury determination as to a defendant's prior felony conviction be made in a bifurcated hearing where the State is seeking an enhanced sentence under subsection (h)(2). *Id*. § 39-17-1324(f). Therefore, we conclude that the offenses of possession of a handgun by a convicted felon requires proof of an element that employing a firearm during the commission of a dangerous felony does not.

Furthermore, the offense of employing a firearm requires proof of the commission of a "dangerous felony," which the offense of being a convicted felon in possession of a handgun does not. Each offense requires proof of an element that the other does not. Therefore, Defendant's dual convictions do not violate double jeopardy. Defendant is not entitled to relief on this issue.

**Consecutive Sentencing**

Finally, Defendant contends that the trial court erred by ordering his sentences in counts 6 and 7 to be served consecutively to each other. The basis of Defendant's argument is that double jeopardy prevents consecutive sentencing in these two counts. However, we have addressed the double jeopardy issue and concluded that dual convictions for the offenses charged in counts 6 and 7 are not barred by double jeopardy. Moreover, we note that Tennessee Code Annotated § 39-17-1324(e) provides that a sentence imposed for a conviction for employing a firearm during the commission or attempt to commit a dangerous felony "*shall* be served consecutive to any other sentence the person is serving at the time of

-18-

the offense or is sentenced to serve for conviction of the underlying dangerous felony." Tenn. Code Ann. § 39-17-1324(e) (emphasis added). The trial court ordered Defendant's sentences in counts 1, 2, 3, and 5 to be served concurrently. Therefore, the statute mandates that his sentence in count 6 be served consecutively to these other sentences.

Additionally, Defendant asserts that the trial court did not make findings of fact necessary to support its order of consecutive sentencing in count 7. Our supreme court has directed that we review felony sentences imposed pursuant to the 2005 amendments to the 1989 Sentencing Act "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). The effective sentence at issue in *Bise* was the result of several sentences ordered to be served concurrently. *Id*. at 687 n. 5. The supreme court has not yet addressed directly what impact, if any, its decision in *Bise* has on our review of consecutive sentences. However, in *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012), in which the supreme court expressly extended the *Bise* standard of review to questions related to probation or any other alternative sentences, the court also cited with approval the case of *State v. Henry Floyd Sanders*, No. M2011-00962-CCA-R3-CD, 2012 WL 4841545 (Tenn. Crim. App. Oct. 9, 2012), *perm. app. granted* (Tenn. Feb. 15, 2013). *Caudle*, 388 S.W.3d at 278. *Henry Floyd Sanders* cited to the *Bise* language in stating the applicable standard of review on the issue of consecutive sentencing is the abuse of discretion standard with a presumption of reasonableness. *Henry Floyd Sanders*, 2012 WL 4841545, at *15.

Moreover, in *Bise*, our supreme court stated that "when the 2005 amendments vested the trial court with broad discretionary authority in the imposition of sentences, de novo appellate review and the 'presumption of correctness' ceased to be relevant." 380 S.W.3d at 708. We note that the relevant Tennessee statute allows appellate review of the following within the context of sentencing: "the length, range or the manner of service of the sentence" as well as "the imposition of consecutive sentences." Tenn. Code Ann. § 40-35-401(a) (Repl. 2010). Therefore, all other components of the "imposition of sentences" are reviewed under this abuse of discretion standard, *Bise*, 380 S.W.3d at 708, and we see no reason for the imposition of consecutive sentencing to be treated differently. Thus, based upon *Bise* and *Caudle*, we conclude that the abuse of discretion standard with a presumption of reasonableness applies to appellate review of consecutive sentencing.

Prior to imposing a sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (Repl. 2010).

The Criminal Sentencing Reform Act of 1989 provides that a trial court may order consecutive sentences on any one or more of several statutory bases. *See* Tenn. Code Ann. § 40-35-115(b) (Repl. 2010). One of those bases is that a preponderance of the evidence establishes that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]" Tenn. Code Ann. § 40-35-115(b)(4). In addition to this criterion, "consecutive sentencing is guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed,'" although specific factual findings are not necessary. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002); *see also* Tenn. Code Ann. §§ 40-35-102(1) (Repl. 2010), -103(2) (2003); *In re Sneed*, 302 S.W.3d 825, 828-29 (Tenn. 2010).

At the conclusion of the sentencing hearing, the court found several enhancement factors and no mitigating factors. As to consecutive sentencing, the trial court did not make any specific findings of fact. However, in stating the applicable enhancement factors, the court found:

The defendant had no hesitation about committing a crime when the risk to human life was high. Any time you're in a situation that people are all about and running – lots of people – some armed – some are not armed, and you take the initiative to start shooting into a crowd like that, this was a very unfortunate incident, but it could have been a lot worse because a lot more

-20-

people could have died as a result of [Defendant's] behavior – and I do mean a lot more people.

The State contends that the findings above also reflect the trial court's determination that consecutive sentencing is reasonably related to the severity of the offenses and necessary to protect the public from further criminal activity by the defendant. Although the record does not reflect that the trial court specifically made these additional findings, we conclude that the trial court did not abuse its discretion in ordering Defendant's sentence in count 7 to be served consecutive to the sentences in the remaining counts. Under the *Bise* standard of review, consecutive sentencing in this case is authorized by statute, and the record supports the imposition of consecutive sentencing. Defendant is not entitled to relief on this issue.

## CONCLUSION

Because the State did not elect an underlying dangerous felony as the basis for Defendant's charge for employing a firearm during the attempt to commit a dangerous felony, and because the trial court failed to instruct the jury as to the dangerous felony underlying the offense, we reverse Defendant's conviction in count 6 and remand for a new trial. In count 3, this case is remanded for entry of a corrected judgment which indicates the disposition of the charge as guilty by jury verdict. In all other respects, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE